UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
OLD ST GEORGE'S LLC, ATK CONSULTING INC.
and THOMAS DeCHIARO

                                Plaintiffs,

          -against-

NICHOLAS BIANCO, individually,
LOUIS CAMPISI, individually,
LINDA COOPER, individually,
BRUCE BARBER, individually,
JOHN TEGEDER, individually,
WILLIAM D. GREGORY, individually,
THE TOWN OF YORKTOWN, and
GEORGE OROS, individually,

                                Defendants.
-------------------------------------------------------------------X

*08 CIV. 5321*

*JUDGE ROBINSON*

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs, by their attorneys, Campanelli & Associates, P.C., as and for their complaint respectfully allege as follows:

## I       NATURE OF THE ACTION

      1.     This is a civil action seeking equitable relief, compensatory damages, punitive damages, costs and attorneys fees, brought pursuant to 42 U.S.C. §§1983, 1985 and 1988, to redress violations of the plaintiffs' rights to petition the government for the redress of grievances, as guaranteed under the 1st Amendment to the United States Constitution, and violations of the plaintiffs' rights to due process as guaranteed under 5th and 14th Amendments to the United States Constitution.

## II      JURISDICTION AND VENUE

2.      Jurisdiction of the court is invoked pursuant to 28 U.S.C. §1331 in that this is a civil action arising under the Constitution and laws of the United States.

3.      Jurisdiction of the court is also invoked pursuant to 28 U.S.C. §1343(a)(3) and §1343(a)(4) to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

4.      Plaintiffs seek declaratory relief and compensatory damages pursuant to 28 U.S.C. §§ 2201(a) and 2202.

5.      Plaintiffs seek permanent injunctive relief pursuant to Fed. R. Civ. P. 65.

6.      Plaintiffs seek reasonable attorney's fees as part of the costs authorized to the prevailing party in an action pursuant to 42 U.S.C. §1983, predicated upon 42 U.S.C. §1988 and 42 U.S.C. §2000.

7.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in Westchester County, New York, and each of the defendants' actual place of business and/or employ was within the Southern District of New York.

## III     <u>THE PARTIES</u>

### A     <u>The Plaintiffs</u>

8.     At all relevant times mentioned herein, plaintiff, OLD ST GEORGE'S LLC, (hereinafter "Old St George") was and still is a Limited Liability Company duly organized under the laws of The State of New York, with its principal place of business located at  10 Gilead Road, Mahopac, County of Putnam, New York 10541.

9.     At relevant times described herein, plaintiff Old St George was, and remains, the owner of the real property situated at Route 6, at 1715 E. Main Street, in Mohegan Lake, New York.

10.     At all relevant times mentioned herein, plaintiff, A T K CONSULTING INC (hereinafter "ATK Consulting") was and still is a Corporation duly organized under the laws of The State of New York, with its corporate offices located at  10 Gilead Road, Mahopac, County of Putnam, New York 10541.

11.     At relevant times described herein, plaintiff ATK Consulting became entitled to occupancy of the real property situated at Route 6, at 1715 E. Main Street, in Mohegan Lake, New York. ATK CONSULTING INC.

12.     At all relevant times mentioned herein, plaintiff THOMAS DeCHIARO, was and still is an individual residing at 10 Gilead Road, Mahopac, County of Putnam, New York 10541.

13.     At all relevant times mentioned herein, plaintiff, Thomas DeChiaro was, and remains the controlling member of plaintiff Old St. George.

3

14.     At all relevant times mentioned herein, plaintiff, Thomas DeChiaro was, and remains, the sole shareholder, and President of, plaintiff ATK Consulting.

### B.     The Defendants

15.     At all relevant times mentioned herein, defendant NICHOLAS BIANCO, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

16.     At all relevant times mentioned herein, defendant NICHOLAS BIANCO, was a Councilman of the Town of Yorktown, and a Member of the Town Board.

17.     At all relevant times mentioned herein, defendant LOUIS CAMPISI, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

18.     At all relevant times mentioned herein, defendant LOUIS CAMPISI, was a Councilman of the Town of Yorktown, and a Member of the Town Board.

19.     At all relevant times mentioned herein, defendant LINDA COOPER, is an individual with an actual place of business or employ was at 363 Underhill Avenue, Yorktown Heights, NY 10598.

20.     As of the date of the commencement of this action, defendant LINDA COOPER'S actual place of business and or employ is now situated at 16 Croton Avenue, Ossining, NY 10562.

21.     At relevant times mentioned herein, defendant LINDA COOPER, was the Supervisor of the Town of Yorktown, and a Member of the Town Board.

4

22.    At all relevant times mentioned herein, defendant BRUCE BARBER, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

23.    At all relevant times mentioned herein, defendant BRUCE BARBER, was the Environmental Code Officer for the Town of Yorktown

24.    At all relevant times mentioned herein, defendant JOHN TEGEDER, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

25.    At all relevant times mentioned herein, defendant JOHN TEGEDER, was, and remains, The Director of Planning of the Town of Yorktown.

26.    At all relevant times mentioned herein, defendant WILLIAM D. GREGORY, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

27.    Upon information and belief, at all relevant times mentioned herein, defendant, WILLIAM D. GREGORY was, and remains, a Building Inspector employed by the Town of Yorktown.

28.    At all relevant times mentioned herein, the defendant, THE TOWN OF YORKTOWN (hereinafter referred to as the "TOWN"), was and continues to be a municipal corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 363 Underhill Avenue, Yorktown Heights, NY 10598.

5

29.     Upon information and belief, at all relevant times mentioned herein, the TOWN, by its agents and/or employees, operated, maintained and controlled The Yorktown Town Board, The Yorktown Planning Board, The Yorktown Building Department and the Office of The Town Clerk.

30.     At all relevant times mentioned herein, defendant GEORGE OROS, was, and remains, a Legislator employed by the County of Westchester, New York

31.     At all relevant times mentioned herein, defendant GEORGE OROS, was and still is, an individual with an actual place of business or employ situated at 148 Martine Avenue, White Plains, New York 10601.

## IV     PRELIMINARY FACTS

### A.     Introduction

32.     This action concerns efforts by the plaintiffs, Thomas DeChiaro and his closely held companies, to operate a vineyard and winery within the County of Westchester, upon two parcels of property, one of which is owned by the County of Westchester, and the other being owned by the plaintiffs.

33.     The plaintiffs leased real property from the County of Westchester, with the County having knowledge that the plaintiffs intended to employ the property as a vineyard upon which to grow wine-making grapes, a use for which the property is acutely suited, since the property is physically situated within the federally certified "*Hudson River Region.*"

6

34.    The *Hudson River Region* is a bounded geographic region which, on July 6, 1982, was certified by the United States Department of Treasury Alcohol and Tobacco Tax and Trade Bureau as an "American Viticultural Area" (AVA), that being a federally designated wine-grape growing region under The United States Code of Federal Regulations Title 27, Part 9, §9.47.

35.    Under federal law, the operators of vineyards in federally certified AVAs are permitted, subject to federal regulations, to produce and market wines made from grapes grown within their respective AVA, and to cause their bottling labels to indicate that the wines were produced from grapes grown within their AVA, provided that not less that 85% of the grapes employed in making such wines were actually grown within the indicated AVA wine-grape growing region.

36.    Under New York State Law, the growing and processing of grapes into wine is recognized as a "farm operation" which falls within the purview of New York Agriculture and Markets Law (Agr. & M), Article 25-AA §301(11).

<u>New York State Agricultural Districts Law</u>

37.    In 1971, the State of New York enacted New York's Agricultural Districts Law Article 25-AA, to provide New York State oversight over farming operations within the State, to enable the State to not only encourage that real property situated within the State be used for farming, irrespective of whether it is owned, or rented, but also to ensure that persons who seek to engage in farming operations are protected, by the State, against unreasonable interference by local governments, such as the Town of Yorktown.

7

38.     By enacting such legislation, the State Legislature ensured that both its intent and its goals were made "crystal clear" by formally adopting an affirmative declaration of its findings and intent.

39.     As adopted, New York Agriculture and Markets Law Article 25-AA 300 provides as follows:

"§300. Declaration of legislative findings and intent

It is hereby found and declared that many of the agricultural lands in New York state are in jeopardy of being lost for any agricultural purposes.
When nonagricultural development extends into farm areas, competition for limited land resources results. Ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements, often leading to the idling or conversion of potentially productive agricultural land.

The socio-economic vitality of agriculture in this state is essential to the economic stability and growth of many local communities and the state as a whole.
It is, therefore, the declared policy of the state to conserve, protect, and encourage the development and improvement of its agricultural land for production of food and other agricultural products.  It is also the declared policy of the state to conserve and protect agricultural lands as valued natural and ecological resources which  provide needed open spaces for clean air sheds, as well as for aesthetic purposes."

New York Agriculture and Markets Law Article 25-AA, §300.

40.     In accord with the explicitly stated legislative intent behind Agr. & M Law Article 25-AA, the New York State Legislature enacted section §305 for the purpose of protecting persons who seek to engage in farming activities, from otherwise overly restrictive rules and ordinances of local governments, such as the defendant Town of Yorktown.

41.    As enacted, New York State Agricultural and Markets Law §305-a explicitly provides that:

> "Local governments . . . shall not unreasonably restrict or regulate farm operations within agricultural districts in contravention of the purposes of this article unless it can be shown that the public health or safety is threatened"

Agricultural and Markets Law Article 25-AA §305-a

42.    As intended by the State Legislature, persons who seek to engage in farming operations could secure protections, in the form of affirmative New York State oversight, against local government "unreasonably" interfering with their farming operations.

43.    To enable persons to secure such State protection, the New York State Legislature created a statutory right for farm operators to file an application to have their respective farming operation added into an existing "Agricultural District." *See* Agricultural & Markets Law Article 25-AA §303, §303-b.

44.    Once a farm operation is included into an Agricultural District, The New York State Commissioner of Agriculture and Markets becomes empowered to review any existing or proposed local law or ordinance to determine whether such local rule or ordinance is overly restrictive, or is being applied in a manner which unreasonably interferes with the farming operation.

45.    To the extent that the Commissioner finds that any such local law or ordinance is overly restrictive or unreasonably interferes with such farming operation, New York State law prohibits any local government, such as the Town of Yorktown, from applying such local law or ordinance to the farming operation.

9

46.     As explicitly provided by statute, the Commissioner may initiate such a review

entirely on its own, or upon the request of a landowner within an Agricultural District.

47.     To the extent that any local government seeks to apply any law or ordinance which

the Commissioner has found to unreasonably restrict such farm operations, the Commissioner is

statutorily empowered to commence an action in the New York State Supreme Court to enforce

§305-a, and obtain a court order permanently enjoining the local government from any efforts to

apply their local law or ordinance against the farming operation.

48.     Acting squarely within with his statutory rights under New York Agriculture and

Markets Law §303-b, in 2006, Mr. DeChiaro submitted an application to the County of

Westchester to have his vineyard and winery included into the County's pre-existing Agricultural

District (Westchester County Agricultural District No. 1).

49.     Upon learning that Mr. DeChiaro had filed an application with the County of

Westchester under §303-b, the defendants became openly angered by what they perceived of as,

and publically proclaimed to be, a deliberate effort to "circumvent their local zoning authority."

50.     Driven by such anger, as exacerbated as a result of Mr. DeChairo's failure and/or

refusal to pay one or more of the defendants "political graft monies," (as had been done by the

previous owner of the plaintiffs' property) the defendants conspired to retaliate, and have

retaliated, against the plaintiffs, and have employed all means in their power, both lawful and

unlawful, to prevent the plaintiffs from operating their winery, and to punish Mr. DeChiaro for

having offended them.

10

51.     As defendant NICHOLAS BIANCO has explicitly stated to numerous persons within the Town, he will "*never*" permit the plaintiffs' winery to open, because he "doesn't like the fact that Mr. DeChiaro went to the County for inclusion into the Agriculture District."

52.     Thereafter, in a deliberate effort to conceal their actions, the defendants conspired to prevent the plaintiffs from securing evidence of the defendants' actions by concealing and destroying records, and causing others to destroy and conceal records, in a calculated effort to additionally deprive the plaintiffs of their statutory rights to secure such records under New York State Freedom of Information Laws, and to prevent the plaintiffs from securing evidence of their violations of plaintiffs' Constitutionally protected rights.

### B.     The Plaintiffs' Desire To Operate a Vineyard and Winery in Accord with Federal and State Laws

53.     During or about 2005, plaintiff Thomas DeChiaro became desirous of pursuing the operation of a vineyard and winery, within which he would grow and harvest wine grapes, and process them into a locally produced New York State wine.

54.     Towards this end, Mr. DeChiaro leased a parcel of property, described herein above, from the County of Westchester within the federally certified *Hudson River Region*.

55.     The farming and agricultural production of grapes into wine requires a place to process the grapes being grown, through processes of de-stemming, crushing, fermentation, and bottling.

11

56.     To fulfill this function of his vineyard and winemaking operation, Mr. DeChiaro purchased real property closely situated to the County-Owned Parcel, on Route 6, at 1715 E. Main Street, in Mohegan Lake, New York.

57.     Upon this property sits a structure which is commonly known as *"The Old Stone Church,"* which has remained unused and unoccupied for the past twenty (20) years.

58.     Mr. DeChiaro had been highly selective in choosing these closely situated specific locations for his vineyard and winery operation, as he sought to derive the benefit of their unique characteristics.

59.     First, the vineyard is situated within the *Hudson River Region* which is home to the oldest continuously operating winery in North America, the *Brotherhood Winery* (established in 1839), as well as the oldest continuously cultivated vineyard in North American (operated by *Benmarl Winery*).

60.     So long as least 85% of the grapes Mr. DeChiaro would use to produce his wine were grown at this location, under federal law, his wine labels could indicate that the wine was produced from this federally certified AVA *Hudson River Region*, from which wines have been produced since at least 1839.

61.     Second, the property is situated at a high elevation, with virtually no shade, thereby effectuating constant sun exposure at all points throughout the day, an essential facet of successful grape production.

62.     Third, the property is in close proximity to, and concomitantly derives positive microclimate effects from, the New York City watershed.

63.    These natural microclimate effects include the tempering of cold air in the winter, and the tempering of hot air in the summer, each of which are advantageous as protections to vineyards.

64.    Fourth, as Mr. DeChiaro had learned from an independent testing laboratory, to whom the County of Westchester had submitted soil samples, the condition and nature of the soil on the property is favorable for use in the growing of wine-making grapes.

65.    Finally, the Old Stone Church was remarkably suited as a home to the wine-making, wine-tasting and selling portion of his intended vineyard/winemaking operation.

66.    Aside from its close proximity to the vineyard, where his grapes have now been growing since May of 2007, the antiquity and "old world" beauty of the nearly one (100) hundred year Old Stone Church was remarkably suited, and uniquely attractive, as a home to his winery operation, and is uniquely suited to attract business for same.

**C.    The *Palmietto* Acquisition Of The Old Stone Church**

67.    Plaintiff Thomas DeChiaro purchased the Old Stone Church from an individual by the name of Michael Palmietto.

68.    Mr. Palmietto had purchased the Old Stone Church, in or about 2000, with the intention of converting it into a café.

69.    At the time of Mr. Palmietto's purchase, defendant NICHOLAS BIANCO was a member of the Yorktown Town Board.

70.    Upon Mr. Palmietto's purchase of the property, defendant BIANCO suggested to Mr. Palmietto that he change his plans to convert the Old Stone Church to a restaurant, instead of a café.

71.    Once Mr. Palmietto agreed to do so, defendant BIANCO agreed to support Mr. Palmietto's efforts to convert the Old Stone Church into a restaurant.

72.    As part of that support, defendant BIANCO appeared on a local television broadcast, and explicitly stated that he thought that the site was a "fine place for a restaurant" and indicated his unequivocal support of the use of the Old Stone Church as a commercial restaurant.

73.    In connection with defendant BIANCO'S "support" of Mr. Palmietto's project, however, when Mr. Palmietto began to pursue the Town approvals necessary for such conversion, defendant BIANCO began making "requests" that Mr. Palmietto commence making contributions to defendant BIANCO, for political dinners and/or other political purposes.

74.    Annexed hereto as Exhibit "A" is a sworn Affidavit wherein Michael Palmietto attests to such requests he received from defendant BIANCO.

14

75.     Significantly, in making these requests defendant BIANCO "insisted" that Mr. Palmietto make such contributions "*in cash*." *See* Exhibit "A" at page 1, paragraph 10.

76.     In addition, despite the fact that Mr. Palmietto was paying for such dinners, defendant BIANCO requested of Mr. Palmietto that he not actually attend any dinners which he had paid for, "to avoid raising any suspicions." *See* Exhibit "A" at page 1, paragraph 10.

77.     For a period of three (3) years during which defendant BIANCO claimed to support Mr. Palmietto's project, Mr. Palmietto contributed over $3,000 in cash contributions to defendant BIANCO, all at defendant BIANCO's request. *See* Exhibit "A" at page 2, paragraph 11.

78.     Upon learning of these "contributions" which were being paid to defendant BIANCO in response to his request for same, another Town Board Member, defendant LOUIS CAMPISI also commenced seeking "contribution" monies from Mr. Palmietto.

79.     Upon information and belief, defendant CAMPISI caused Yorktown Highway Superintendent, Eric DiBartolo to approach Mr. Palmietto on numerous occasions, and to request "contributions" for defendant CAMPISI. *See* Exhibit "A" at page 2, paragraph 12.

80.     In requesting these contributions for defendant CAMPISI, Mr. DiBartolo advised Mr. Palmietto that Mr. CAMPISI'S vote, in favor of the Town Board approval needed by Mr. Palmietto, was "in the bag." *See* Exhibit "A" at page 2, paragraph 12.

81.     In the months which followed, Mr. Palmietto received additional requests from Mr. DiBartolo, and paid him additional sums which eventually totaled  seven thousand $7,000.00 dollars. *See* Exhibit "A" at page 2, paragraph 13.

82.     In requesting and receiving such monies, Mr. DiBartolo explicitly advised Mr. Palmietto that the monies were being used "for political campaigns which would help get Mr. Palmietto's project approved." *See* Exhibit "A" at page 2, paragraph 13.

83.     During the period within Mr. Palmietto was pursuing the Town approvals necessary to open his restaurant, which included Town Board approval, Mr. Palmietto had "contributed" a cumulative sum of over ten thousand ($10,000.00) dollars in response to requests he had received from defendant Town Board Members BIANCO and CAMPISI.

84.     Upon information and belief, although it was initially unknown to defendant BIANCO, defendant BIANCO ultimately came to learn that Mr. Palmietto had been "contributing" monies to defendant CAMPISI at the same time than he had been "contributing" monies to defendant BIANCO.

85.     Upon learning of same, defendant BIANCO became upset, and affirmatively directed Mr. Palmietto to stop giving money to defendant CAMPISI, either directly or through Mr. DiBartolo. *See* Exhibit "A" at page 2, paragraph 18.

86.     Upon information and belief, upon ultimately learning that the lion's share of more than ten thousand ($10,000.00) dollars had been given to CAMPISI rather than to him, defendant BIANCO became angered and possessed of an intent to now defeat Mr. Palmietto's project, in retaliation.

87.     Towards this end, defendant BIANCO wielded his influence over, and conspired with, the other Town Board members, thereby causing them to vote against Mr. Palmietto's project, thereby defeating it.

88.    Simultaneously, in a deliberate and calculated effort to ensure the "death" of Mr. Palmietto's project, defendant BIANCO posited that the property should be acquired by the Town and converted into a museum.

89.    Once asserting this position, defendant BIANCO approached Mr. Palmietto and directed him to "think of a price."

90.    Unwilling to bow to defendant BIANCO's demands to surrender the property to the Town, and despite defendant BIANCO'S success in causing the Town to vote against his project, Mr. Palmietto sought to secure a purchaser who would buy the property from him, at market value.

91.    Mr. Palmietto succeeded in securing an offer of $750,000.00 from a potential purchaser, subject to Mr. Palmietto's ability to secure a sewer permit from the Town.

92.    Not surprisingly, however, Mr. Palmietto was unable to secure such sewer permit from the Town.

93.    Upon information and belief, defendants BIANCO, CAMPISI and COOPER wielded their influence within the Town to prevent Mr. Palmietto from securing sewer permits, with the intended purpose of preventing Mr. Palmietto from selling the property to the third party who was desirous of purchasing it from Mr. Palmietto.

94.    The defendants' efforts were successful, as the purchaser abandoned the purchase as a result of Mr. Palmiettos inability to secure the sewer permits.

95.    Thereafter, a separate individual, Mr. Bondi, acting under the direction of, and in conspiracy with, defendant BIANCO, approached Mr. Palmietto and offered him $400,000.00 to purchase the property.  *See* Exhibit "A" at page 3, paragraph 28.

96.    As had apparently been arranged by defendant BIANCO, the Town defendants immediately "endorsed" what they believed to be the pending sale to Mr. Bondi, and then proceeded to issue the needed sewer permits without delay. *See* Exhibit "A" at page 3, paragraph 29.

97.    Much to the dismay of defendant BIANCO, and the other defendants, however, Mr. Palmietto did not proceed to sell the property to the purported buyer which had been chosen by defendant BIANCO.

98.    Instead, Mr. Palmietto sold the property to plaintiff Thomas DeChiaro herein, which further offended the defendants. *See* Exhibit "A" at page 3, paragraph 30.

**D.    The *DeChiaro* Acquisition Of The Old Stone Church**
**And Encounter With Corruption Inherent**
**Within The Town of Yorktown Government**

99.    In 2005, plaintiff Thomas DeChiaro purchased the Old Stone Church with the intent of using the property for his combined vineyard and winery operation.

100.    As set forth herein above, Mr. DeChiaro had selected the Old Stone Church as a location at which to pursue creation of a vineyard and winery because of the unique physical characteristics of the properties, and the federal and state laws which govern the use of the properties for such a farming operation.

101.    Upon purchasing the Old Stone Church, plaintiff Thomas DeChiaro was made immediately aware of blatant corruption within the Town, as deliberately carried out and enforced by the defendants herein.

18

102.    As had been made clear to Mr. DeChiaro by Mr. Palmietto, the previous owner of the Old Stone Church, when a person or entity seeks to pursue commercial use of property within the Town of Yorktown, the defendants would seek "political contributions," *in cash*, from such person or entity.

103.    So long as the recipient of such requests responded by making such "contributions," the defendants would process and approve whatever applications would be necessary for the project to be completed.

104.    In addition, the defendants personally, or through their agents, would "tell" property owners which specific contractors or other service providers they "needed" to hire, in developing their property, and seeking any Town approvals in connection therewith.

105.    If, as Mr. DeChiaro would learn, a property owner rebuffed or refused such requests, the defendants would deliberately delay or prevent the property owner from securing approvals necessary for the property owner to pursue their desired commercial venture.

106.    Consistent with what Mr. Palmietto had experienced earlier, upon Mr. DeChiaro making it known to the defendants that he was seeking to open a winery at the Old Stone Church, plaintiff DeChiaro began to receive similar "contribution requests" and "hiring directions" from the defendants.

107.    First, representatives of the Town "suggested" that Mr. DeChiaro "should" retain a specific attorney in connection with his applications, and they advised him that he "needed" to hire a specific contractor to perform his electrical work.

108.    Thereafter, several representatives of the Town approached Mr. DeChiaro and "requested" that he commence making financial "contributions" to defendant BIANCO.

19

109.    Each time he received such a request, however, Mr. DeChiaro refused to make any "contributions" whatsoever, to defendant BIANCO.

110.    Succinctly stated, Mr. DeChiaro simply refused to concede to the defendants' unlawful demands or requests for what he perceived of as "graft monies" or political patronage hirings of commercial vendors chosen by the defendants.

111.    In January 2006, Mr. DeChiaro filed an application under New York Agriculture and Markets Law §303-b to have the parcels he had chosen for the operation of his vineyard and winery added into an Agricultural District by the County of Westchester.

**E.    The Defendants Attack Upon The Plaintiffs For a Perceived Offense, and For The Plaintiffs' Refusal to Pay Political Graft Monies**

112.    Upon learning that Mr, DeChiaro had filed an application with the County under Agriculture and Markets Law §303 the defendants became openly enraged against Mr. DeChiaro.

113.    "On the record" the defendants openly expressed their anger against Mr. DeChiaro at numerous public meetings, citing as the alleged basis of their anger, that in filing his application under §303-b, Mr. DeChiaro had deliberately attempted to "circumvent" *their authority*.

114.    In heated public meetings the defendants expressed this as the basis of their open and obvious animosity against Mr. DeChiaro.

115.    During at least one public meeting, defendant BIANCO employed his own words to express his personal anger against the plaintiffs action of having filed such application with the County of Westchester, by stating:

> "this wasn't an *end run* around [our authority] it was *a quarterback sneak*."

20

116.    On numerous occasions defendant BIANCO explicitly stated to numerous persons within the Town, that he will "*never*" permit the plaintiffs' winery to open, because he "doesn't like the fact that Mr. DeChiaro went to the County for inclusion into the Agriculture District."

117.    Upon information and belief, defendants BIANCO, CAMPISI and COOPER exercised their influence over other Town Board Members to similarly adopt anger at the plaintiffs' "perceived offense" against the Town.

118.    Virtually all of the Yorktown Town Board members publically vocalized that they were "offended" by Mr. DeChiaro's act of filing the Agricultural District application with the County of Westchester.

119.    In publically reprimanding Mr. DeChiaro for the act of having filed that application, Town Board Member Matthew Metz publically stated to Mr. DeChiaro:

> "The problem here is this. You can't come in and say that I'm an
> agricultural district, or I'm about to get into one, I really don't need you
> guys for anything cause I can do what I want. But, you know, I'm
> willing to talk to you guys about how we're gonna do this.
> My opinion is that approach is wrong."
>
> Public Statement of Yorktown Town Board Member Matthew Metz at
> Yorktown Town Board Meeting of November 7, 2007.

120.    Aside from being angered by Mr. DeChiaro having exercised his statutorily provided right to file such application with the County, upon information and belief, defendants BIANCO and CAMPISI were further angered by the plaintiffs refusal to pay political graft monies, which they had become accustomed to having received from the previous owner of the property, Mr. Palmietto.

21

121.    Apparently angered by Mr. DeChiaros refusal to make such monetary contributions to the defendants, despite repeated requests for same, defendants BIANCO and CAMPISI proceeded to retaliate by wielding their influence and power as Members of the Town Board to prevent the plaintiff from ever operating a winery at the Old Stone Church, and to punish Mr. DeChiaro for his "impertinence."

**F.    Defendants Wield Their Power and Influence to Punish The Plaintiff and to Ensure That The Plaintiffs' Desired Use is Prevented**

122.    Upon information and belief, defendants BIANCO, CAMPISI and COOPER conspired with, and unlawfully influenced, defendants, BARBER, TEGEDER, GREGORY and OROS, to punish Mr. DeChiaro for what they perceived to be his impertinence.

123.    To punish Mr. DeChiaro the defendants conspired to, and did:

(a)    Commenced an "all-out assault" upon Mr. DeChiaro's efforts to secure necessary approvals from other authorities, which included both the State of New York, and The County of Westchester, by calling-in political favors with persons in power within those respective authorities, and conspiring with them to cause each respective agency to delay or deny Mr. DeChiaro's applications; and

(b)    Exerted their influence over, and conspired with, the other defendants, and other Town employees, to prevent Mr. DeChiaro from obtaining any approvals, whatsoever, from the Town, irrespective of whether or not Mr. DeChiaro is legally entitled to such approvals, and

22

(c)    Caused the fabrication and filing of false charges against Mr. DeChiaro, and attempted to influence other authorities to similarly file baseless charges against him.

    (i)    **The Defendants Refusal to *"Recognize"* Mr. DeChiaro's Desire To Employ his Property as Part of his Farming Operation**

124.    Motivated solely by their personal animus toward Mr. DeChiaro, the defendants have refused to acknowledge that Mr. DeChiaro's intended use of his property constitutes, and would constitute, *a farming operation*, and have refused to permit him to conduct same, based upon their false denials.

125.    These baseless and frivolous denials have even extended to include a denial that the plaintiffs' vineyard, upon which the plaintiff has been growing wine-making grapes since May 2007, is *actually* a vineyard.

126.    In denying same during an appearance before the County of Westchester Board of Legislators, defendant NICHOLAS BIANCO explicitly advised County Legislators that he had "been to" the vineyard, and that *"it just looked like a bunch of weeds to me."*

127.    Significantly, defendant BIANCO, uttered this statement during an appearance before the County Legislators, which appearance was made by defendant BIANCO in an attempt to convince the County to deny the plaintiffs' application for inclusion into the County's Agricultural District.

128.    As was confirmed to Mr. DeChiaro by the New York State Department of Agriculture and Markets, the combined vineyard and winery operation desired by the plaintiffs constitutes a "farm operation" under New York Agriculture and Markets Law, Article 25-AA §301(11).

129.    Annexed hereto as Exhibit "B" is a letter which the plaintiffs received from the Department of Agricultural and Markets confirming same to plaintiff DeChiaro.

130.    As set forth within the letter which Mr. DeChiaro received from the State, "farm operation" includes buildings that are used to produce, prepare and market crops, grapes are crops, and the processing of grapes into wine and marketing them are considered part of a "farm operation." (See Exhibit "B").

131.    The property owned by Mr. DeChiaro with the TOWN is zoned R1-20

132.    Under the Town Code of Yorktown, farming is a permitted use of property which is zoned R1-20, and the plaintiff is entitled to engage in this use of his property "as a matter of right" under the Town Code.

133.    Under Yorktown Town Code 300-21(C)(1)(a)(4) explicitly states that "permitted main uses" of property zoned R1-20 includes:

> [4] Farms, farm uses, customary farm operations . . .
> provided that  no retail sales space greater than 500 feet in area
> is maintained on the premises in connection with their use"

> Yorktown Town Code 300-21(C)(1)(a)(4)

134.    Based upon their disingenuous refusal to acknowledge that the plaintiffs vineyard and winery operation constitutes, or would constitute a "farming operation" despite the fact that State of New York has acknowledged that the plaintiffs operation falls squarely within the statutory definition of same, the defendants have refused to issue the plaintiffs a Certificate of Occupancy (CO) for the plaintiffs use of the Old Stone Church, as part of their farming operation.

135.    Acting under the direction and influence of defendant BIANCO defendant WILLIAM D. GREGORY (the Town Building Inspector) has affirmatively refused to grant the plaintiffs a CO by letter wherein defendant GREGORY posited:

> "The schedule of regulations of the Zoning Code of the Town of Yorktown
>          presently does not provide for the type of use you describe in this zoning
> district.  Consequently I cannot grant approval to conduct a for-profit winery
> at the site.
> I would again suggest that if you wish to pursue this matter, that you make
> application to the Town Board of the Town of Yorktown for a zone change or
> amendment."

136.    In accord with defendant BIANCO's statement made to numerous people within the Town that he will *never* permit Mr. DeChiaro to "open his winery" defendant BIANCO caused defendant GREGORY to adopt the position that Mr. DeChiaro "needs a variance" because, as representatives of the Town have already advised Mr. DeChiaro, the Town Board (upon which defendant BIANCO sits) will never grant him any type variance.

(ii)     **The Plaintiffs' Agricultural District Application**
**Before The County of Westchester**

137.     In furtherance of their conspiracy, the defendants engaged in a consistent and systematic pattern of misconduct which was intentionally and maliciously intended by the defendants to delay and ultimately defeat each and every application, of any type, which the plaintiffs' submitted to either the State of New York, The County of Westchester, or the Town of Yorktown.

138.     As enacted, New York Agriculture and Markets Law, created a specific definition for a "farm operation" which, for purposes of Article 25-AA, is explicitly defined as follows:

> "11. "Farm operation means the land and on-farm buildings, equipment . . . handing facilities and practices which contribute to the production preparation and marketing of crops . . . as a commercial enterprise . . .
> Such farm operation may consist of one or more parcels of *owned or rented* land, *which parcels may be contiguous or noncontiguous to each other*"

> New York Agriculture and Markets Law §301(11) [italics added]

139.     The two parcels upon which Mr. DeChiaro seeks to operate his combined vineyard and winery operation falls squarely within this state-law definition, as he seeks to operate the vineyard and winery on the two noncontiguous parcels of property described herein above (one rented from the County and one owned), and the New York State Department of Agriculture and Markets has explicitly confirmed same to Mr. DeChiaro. (*See* Exhibit "B")

140.    Despite the explicit language of New York State law which provides otherwise, the defendants, acting as representatives of the Town of Yorktown, have refused to recognize that a farming operation may be conducted on *noncontiguous* parcels of property, as intended by Mr. DeChiaro.

141.    Alternatively stated, the defendants have refused to "recognize" the parcel which Mr. DeChiaro owns, as being part of a "farming operation" under the pretext that it is <u>not</u> part of such farming operation because it is not *contiguous* to the vineyard.

142.    This is precisely the type of unreasonable interference which New York Agriculture and Markets law Article 25-AA was enacted to protect farmers against.

143.    Acting in accord with his statutorily created right under Agricultural and Markets Law §305-a, in 2006, Mr. DeChiaro submitted an application to The County of Westchester to have his vineyard and winery operation included into Westchester County Agricultural District Number 1.

144.    By securing inclusion into the Agricultural District, Mr. DeChiaro would become veiled with all of the protections which Article 25-AA were intended to afford, including, but not limited to, empowering the State Commissioner of Agriculture and Markets to review, and if necessary prevent, the defendants from unreasonably interfering with the plaintiffs' farming operation.

## The County Prepares to Grant Mr. DeChiaro's Application

145.    Upon receipt of the plaintiffs' application for inclusion into the County's Agricultural District, the County of Westchester submitted the application to its Agricultural and Farmland Protection Board for its review and consideration.

146.    Upon conducting such review and consideration, the Agricultural and Farmland Protection Board prepared a Report wherein it affirmatively recommended to the County that the plaintiffs' application be granted.

147.    A true copy of the Farmland Protection Board Report is annexed hereto as Exhibit "C."

148.    In accord with that recommendation, Westchester County Executive, Andrew J. Spano, submitted proposed County Legislation, which had been prepared by his office, to the Westchester County Board of Legislators, to be adopted as the first step in including Mr. DeChiaro's operations into the County's Agricultural District.

149.    Annexed hereto as Exhibit "D" is a true copy of a letter from the County Executive, which accompanied such proposed legislation.

150.    Thereafter, the County Legislature referred the application to the County's Committee on Energy and The Environment, to review and consider the recommendations of the County's Agricultural and Farmland Preservation Farmland Committee, and to prepare a report and recommendation to the Board of Legislators regarding same.

151.    In accord with such directive, the Committee conducted such review, and submitted a formal report to the Board of Legislators, recommending that Mr. DeChiaro's application for inclusion into the Westchester County Agricultural District No. 1 be granted.

152.    A true copy of the Committees report is annexed hereto as Exhibit "E."

153.    Towards that end, the County proceeded to prepare both a resolution to hold a public hearing upon Mr. DeChiaro's application, and a public notice of such hearing, which are collectively annexed hereto as Exhibit "F."

154.    In compliance with the New York State Environmental Quality Review Act, 6 NYCRR Part 617, (SEQRA), the County prepared an Environmental Assessment Form wherein the County's Director of Environmental Planning:

(a)    indicated that the County's "proposed action" was to recommend inclusion of the property into the County's Agricultural District (*See* Exhibit "G" at Part I, # 6), and

(b)    indicated, as the effect of such inclusion upon existing zoning or land use restrictions was that "Municipalities in which Agricultural Districts are located . . . are prohibited from unreasonably restricting agricultural operations through local zoning (*See* Exhibit "G" at Part I, # 8) and

(c)    certified that the inclusion of Mr. DeChiaro's farming operation *would not have an adverse impact on the environment.*

(*See* Exhibit "G" at Part II, C).

29

155.    A true copy of the County's competed Environmental Assessment Form is annexed hereto as Exhibit "G."

156.    Also in compliance with the New York State SEQRA the County prepared a "Negative Declaration" based upon the County's determination that inclusion of Mr. DeChiaro's farming operation would not have a significant adverse effect upon the environment.

157.    A true copy of the County's Negative Declaration is annexed hereto as Exhibit "H."

158.    *Finally*, the County prepared a formal resolution to include Mr. DeChiaros farming operation into the County's Agricultural District, which, once passed by the County Board of Legislators, would have effectuated same.

159.    A true copy of such resolution is annexed hereto as Exhibit "I."

<u>The Defendants Retaliatory and Unlawful Intervention</u>

160.    As set forth herein above, the defendants became enraged against Mr. DeChiaro because, as they explicitly articulated, they interpreted Mr. DeChiaro's filing of an application with the County, under New York Agricultural and Markets Law Article 25-AA, as an "effort to circumvent their authority."

161.    In a deliberate effort to punish Mr. DeChiaro, the defendants proceeded to engage in an underhanded course of actions through which they have succeeded in preventing the County from granting Mr. DeChiaro's application.

30

162.    As Mr. DeChiaro has been explicitly advised by Westchester County employees, defendants BIANCO, CAMPISI and COOPER "put a great deal of pressure" upon County employees who were possessed of responsibilities in processing and approving Mr. DeChiaro's application, in an underhanded effort to induce the County to deny his application.

163.    More specifically, the defendants employed undue political influence, including, but not limited to, conspiring with, and enlisting the assistance of a County Legislator, to defeat Mr. DeChiaro's application.

164.    Mr. DeChiaro has been <u>affirmatively advised</u> that the defendants BIANCO, CAMPISI and COOPER brought "great pressure to bear" upon County employees, <u>by several County employees,</u> which included, but were not limited to: The Commissioner of the Westchester Department of Planning, Gerard E. Mulligan, The Director of Environmental Planning, David S. Kvinge, ASLA Director, Lucille Munz, and a Member of The Westchester County Farmland Protection Board, Thomas Kiger.

165.    Upon information and belief, defendant BIANCO wielded undue political influence and enlisted the assistance of County Legislator, defendant GEORGE OROS, who, as a political favor to defendant BIANCO, agreed to (in his own words) "*use all means within his power*" to defeat Mr. DeChiaro's application which was then pending before the County of Westchester.

166.    As was well known to defendant OROS, after reviewing Mr. DiChairo's application, the Westchester County Agricultural and Farmland Protection Board affirmatively recommended that the application be granted.

167.    Notwithstanding the forgoing, at the request of, and in conspiracy with, defendant BIANCO, defendant OROS assisted defendant BIANCO by, in his own words, "*using all means in his power*" to defeat the application.

168.    Upon information and belief, towards this end, defendant OROS exerted political influence over Westchester County employees to dissuade them from approving, or indicating their approval of, Mr. DeChiaro's application.

169.    In addition, defendant OROS employed County monies to send a letter to all residents of Mohegan Lake to parrot patently false claims concerning Mr. DeChiaro's application which, upon information and belief, were "*spoon fed*" to him by defendant BIANCO.

170.    Mimicking the attitude which had been displayed earlier by defendant BIANCO, defendant OROS drafted and mailed a letter within which defendant OROS represented to all Mohegan Lake residents that Mr. DeChiaro's application was:

"Another example of using clever loopholes to circumvent zoning"

171.    "If the County were to grant" (Mr. DeChiaro's application) defendant OROS proceeded to falsely advise residents:

"it would remove much of the existing zoning restrictions and requirements
as well as environmental regulations. Without reasonable controls in place,
this designation could lead to increased development of the parcel.
Such development would adversely impact the surrounding wetlands potentially
leading to more flooding."

32

172.    A true copy of defendant OROS' letter is annexed hereto as Exhibit "J."

173.    The representations made by defendant OROS were false, and upon information and belief, were affirmatively known to be false by defendant OROS at the time he made them to the residents of Mohegan Lake.

174.    Contrary to his falsely stated pretexts otherwise, defendant OROS expended County monies to send that letter to all Mohegan Lake residents, not due to any legitimate environmental or other public concerns, but solely as a political favor to defendant BIANCO.

175.    Upon information and belief, at the time he sent that letter (Exhibit "J") defendant OROS was well aware that the County's Director of Environmental Planning had affirmatively determined, and Certified, that the use of Mr. DeChiaro's property as part of his vineyard and wine-making operation would not have any adverse impact on the environment.

176.    Moreover, a complete review of each and every file maintained by the County of Westchester regarding or concerning Mr. DeChiaro's property, which review has been conducted by the plaintiffs, has revealed an absolute and complete lack of any record, expert report, consultant report, analysis, data, indicia or any document whatsoever, which indicates, or provides any basis for any conclusion, that granting Mr. DeChiaro's application could have the potential adverse environmental effects claimed by defendant OROS in his letter to Mohegan Lake residents.

177.    As such, defendant OROS had no legitimate basis to believe the truth of the claims he asserted in his letter which were, in fact, pure fabrications which he published for the actual purpose of serving as a pretext to defeat Mr. DeChiaro's application before the County.

178.    Moreover, his act of publishing such fabrications to every resident of Mohegan Lake was not to address any concerns of local residents since, as defendant OROS was personally well aware, the residents overwhelmingly supported Mr. DeChiaro's application, as reflected within a plethora of communications, which had been received by defendant OROS and the other County Legislators, from residents.

179.    Annexed hereto as Exhibit "K" are true copies of e-mail communications which the plaintiff secured directly from the County of Westchester through a FOIL request, which were received by County Legislators, including defendant OROS, wherein local residents indicated their support of Mr. DeChiaro's application.

180.    As a Legislator, defendant OROS was also acutely aware that inclusion of Mr. DeChiaros' property into the Agricultural District would not "remove" any "environmental regulations," but he proceeded to deliberately and broadly publish a materially false statement that it would, as a falsehood which he uttered in a calculated effort to secure support from residents in his efforts to "kill" Mr. DeChiaro's application. (*See* Exhibit "J," second paragraph)

181.    In a coordinated measure, defendant BIANCO caused the Yorktown Town Attorney, Kevin P. Sweeney, to draft a letter to Mr. DeChiaro wherein the attorney purported the existence of amorphous violations of "local and state codes" and, of greater import, to serve a copy of such letter upon the Westchester County Board of Legislators.

34

182.    The purpose of such letter was not to inform Mr. DeChiaro of any alleged "code violations" but to create the false appearance that some type of zoning violations existed, and to "bootstrap" an argument to be presented to the County, that the County should not grant Mr. DeChiaro's application to be included into the Agricultural District, because there existed such outstanding violations.

183.    In conjunction with these efforts, defendants BIANCO and COOPER appeared before the County Board of Legislators, and proceeded to make false and/or misleading statements in an underhanded effort to stop the County from its then intended action of granting Mr. DeChiaro's application.

184.    As a direct result of the defendants' actions, and due to the undue influence of defendants BIANCO, CAMPISI, COOPER and OROS, the County's Agricultural and Farmland Protection Board has reversed its position one hundred and eighty degrees, and contrary to its earlier recommendation to the opposite, the Committee has now issued a recommendation *against* approving Mr. DeChiaro's application to have his vineyard and farming operation included into Westchester County Agricultural District No. 1., and the County has denied Mr. DeChiaro's application as a result of same.

**(iv)    The Plaintiff's Application to The
New York State Liquor Authority**

185.    As described herein above, the defendants engaged in calculated efforts to retaliate

against Mr. DeChiaro for having filed an application under Agriculture and Markets Law Article

25-AA, and for his refusal to pay political graft monies, to one or more of the defendants.

186.    Their efforts, however, were not limited to employing underhanded conduct and

unlawful influence to defeat Mr. DeChiaro's application before the County of Westchester.

187.    To operate his vineyard and winery, Mr. DeChiaro is additionally required to secure

a liquor license, from the New York State Liquor Authority.

188.    At all times described herein, Mr. DeChiaro (and the other plaintiffs) possessed a

statutorily created right under New York State Law, to apply for such a license.

189.    In accord with his statutorily provided right to do so, Mr. DeChiaro filed an

application for a New York State Liquor license.

190.    In a calculated effort to prevent Mr. DeChiaro from obtaining a liquor license from

the State Liquor Authority, defendant BIANCO sought to have fabricated and "unfounded"

wetlands violations charged against the plaintiffs, and then to posit to the State Liquor Authority

that it should not issue a New York State Liquor License to the plaintiffs, due to the fact that the

plaintiffs had outstanding violations with state or local authorities.

191.    Towards this end, defendant BIANCO directed defendant BRUCE BARBER to

contact the New York State Department of Environmental Conservation (the DEC), and to request

that the DEC issue state wetlands violations against Mr. DeChiaro.

192.    In response to defendant BIANCO's request, an enforcement Officer of the DEC, Officer Chrisman Starczek, contacted Mr. DeChiaro and requested an on-site meeting with Mr. DeChiaro, on his property, to examine and discuss the violations alleged by the Town.

193.    After Mr. DeChiaro honored this request, and met with Officer Starczek, Officer Starczek advised Mr. DeChiaro that he would not issue the violations which had been *"requested by the Town"* because they were *"unfounded."*

194.    Undeterred by the fact that representatives of the DEC had declined defendant BIANCO's request that they issue "unfounded" violations against the plaintiff, defendant BIANCO proceeded to direct defendant BARBER, the Town's Environmental Code Officer, to sign and file a criminal complaint against the plaintiff for such unfounded violations, and to file same before the Town of Yorktown Justice Court.

195.    Defendants BIANCO and BARBER did not cause the filing of that criminal complaint based upon any legitimate belief that genuine violations had been committed by the plaintiffs.

196.    They caused the filing of that complaint to retaliate against Mr. DeChiaro for having filed his application under Agriculture and Markets Law §305, and for his refusal to pay political graft monies to defendant BIANCO.

197.    Thereafter, defendant BIANCO contacted the New York State Liquor Authority, to persuade them to deny Mr. DeChiaro's application by employing political influence, and by claiming that the his application should be denied, based upon the "outstanding violations" which had been fabricated under the direction of defendant BIANCO.

37

198.   As was known to defendant BIANCO, there was no rational connection between Mr. DeChiaro's application for a liquor license, and the purported "wetlands violations" which could serve as an argument that the latter should affect the former.

199.   Defendant BIANCO's motivation in intervening with Mr. DeChiaro's application for a liquor license was pure spite, malice, and as part of his ongoing efforts to "punish" Mr. DeChiaro.

200.   In addition, defendant BIANCO deliberately provided false information to the Liquor Authority as part of his deliberate effort to persuade the Authority to deny Mr. DeChiaro's application for a liquor license.

201.   Due to defendant BIANCO's influence, and for no other reason, the New York State Liquor Authority denied Mr. DeChiaro's application to obtain a liquor license for his vineyard and winery operation.

### G.   The Defendants Concealment and Destruction of Records In a Deliberate Effort to Conceal Their Actions

202.   In a calculated and deliberate effort to conceal their actions, as described herein above, the defendants have concealed public records, destroyed public records, and upon information and belief, have conspired and caused other to conceal and/or destroy public records, to deprive the plaintiff access to such records, in direct violation of the plaintiffs rights of access to same, under New York State laws.

203.   Under New York State Freedom of Information Law, at all times described herein, Mr. DeChiaro and the other plaintiffs were possessed of the right to review, inspect, and secure copies of, public records of the defendant Town of Yorktown, and State of New York.

204.    More specifically, New York Public Officers Law, Article 6, §87 explicitly mandates that any government entity or agency, including the Town of Yorktown, maintain its records and an inventory of same, and that it make all of its records available for public review, upon any request for same.

205.    Upon information and belief, the defendants have deliberately "censored," and caused others to censor public records, to the extent that all public records which reflected or evidence their conduct, as described herein have been destroyed, concealed, or deliberately "misplaced"

206.    Upon information and belief, acting under the direction of defendants BIANCO and CAMPISI and COOPER, the Town Clerk, Alice Roker, deliberately "censored" Town records, removing from same any documents and/or communications which evidenced or reflected the defendants conspiracies as described herein.

206.    In accord with his statutory right under New York FOIL law, but without warning to the defendants, Mr. DeChiaro appeared at Town Hall, and served a written FOIL request to review the Town file regarding his property.

207.    In response to this FOIL demand, and in the presence of both Mr. DeChiaro and a his accountant, Barbara Major, the Town Clerk, Alice Roker, advised Mr. DeChiaro that he could not review the Town's file on his property, because it contained "sensitive information" which he was not permitted to see.

208.    In accord with this position, the Town Clerk took the file, and together with an assistant, began removing documents from the file to prevent Mr. DeChiaro from ever seeing them.

209.    Within Mr. DeChiaro's personal view, the Town Clerk and her assistant removed

each and every item of communication which the defendants had sent to State and County

representatives, inclusive of any and all letter and e-mails, prior to making such files available to

Mr. DeChiaro, in direct violation of New York FOIL law, and Mr. DeChiaro's rights to inspect and

copy such records under New York State law.

210.    Mr. DeChiaro knew of the existence of such communications by and between the

defendants to State and County representatives, because he had obtained copies of *some* of the

communications directly from the County, and one or more State representatives had

acknowledged the existence of others to Mr. DeChiaro.

211.    But, as had been "arranged" by defendants BIANCO, CAMPISI and COOPER,

every single communication between any of the defendants and any State or County representative,

have been removed from the Town files, and, as set forth herein below, many, if not all, have been

destroyed by the defendants to ensure the permanent elimination of such documentary evidence of

their conspiracy against Mr. DeChiaro.

## Defendant LINDA COOPER
## Town Supervisor

212.    As set forth herein, defendant LINDA COOPER acted in conspiracy with the other

defendants in a deliberate effort to prevent Mr. DeChiaro from obtaining State and/or County

approvals associated with his efforts to open his winery, and undertook efforts to influence others

to do the same.

40

213.    Acting in furtherance of this conspiracy, and veiled with her authority as Supervisor of the Town of Yorktown, defendant COOPER sent numerous letters and communications to multiple officials seeking to influence them deny Mr. DeChiaro's applications, including, but not limited to, the Westchester County application to have Mr. DeChiaro's property included into the County's pre-existing Agricultural District.

214.    In a calculated effort to conceal these actions she took in furtherance of the conspiracy described herein, before leaving her official office as Supervisor, defendant COOPER intentionally destroyed all files within her Office, as Supervisor, which contained evidence or documents evidencing her acts taken in furtherance of the conspiracy against Mr. DeChiaro.

215.    In an effort to secure such evidence under Freedom of Information Law (FOIL), Mr. DeChiaro served a FOIL request upon the defendant Town, requesting that the Town make all of its records available for the plaintiffs inspection and review, including but not limited to, the records which were being maintained with the Office of the Town Supervisor, defendant LINDA COOPER.

216.    In response to this request, Mr. DeChiaro was provided with files from which every item of communication by and between defendant COOPER and any other authority, including but not limited to the County of Westchester, had been removed.

217.    In an effort to secure electronically stored copies of such letters, and communications, the Clerk to the Town Board, Janet Protano, opened the Towns computer records (in the presence and view of Mr. DeChiaro and his accountant), and proceeded to advise Mr. DeChiaro that the entire hard-drive directory, which was entitled "Old Stone Church," and all of the computer files which it contained, were gone.

218.    In addition, Ms. Protano explicitly advised Mr. DeChiaro that defendant COOPER had "deleted" everything contained within the "Old Stone Church" directory on the computer system, and all of the files and documents which were contained therein, "before she left office."

219.    But the defendants effort to conceal evidence of their efforts extended beyond the records maintained by the Town.

FOIL Request To
The New York State Liquor Authority

220.    As described herein above, Mr. DeChiaro filed an application to the State Liquor Authority to secure a liquor license necessary for the operation of his winery.

221.    As further described herein above, through improper political influence defendant BIANCO caused the State Liquor Authority to deny Mr. DeChiaro's application.

222.    In the course of their conspiracy against Mr. DeChiaro, defendants BIANCO and COOPER sent written communications and/or e-mails to the State Liquor Authority.

223.    In an effort to exercise his rights under New York Freedom of Information law, Mr. DeChiaro attempted to secure copies of the defendants' letters and/or e-mails to the State Liquor Authority, by serving a FOIL request upon the Liquor Authority.

224.    Upon information and belief, defendants BIANCO and COOPER learned that Mr. DeChiaro was attempting to secure copies of the communication which they had sent to the State Liquor Authority, and upon learning of same, influenced one or more agents or employees of the State Liquor Authority to abstain from providing copies of the defendants communications to the Liquor Authority.

225.    Acting Squarely within his rights under New York State Freedom of Information Law, in April 2008, Mr. DeChairo submitted a formal FOIL request to the New York State Liquor Authority, to obtain copies of the communications which the defendants had sent to the Liquor Authority, wherein the defendants sought to induce the Liquor Authority to deny Mr. DeChiaro's application for a liquor license.

226.    In accord with directives on the State Liquor Authority's internet web site, Mr. DeChiaro sent that FOIL request, by filling out a form provided on the web site, and submitting same electronically.

227.    After receiving no response to his FOIL request, Mr. DeChiaro contacted the State Liquor Authority, and spoke to Ms. Kimberly Morella, The Deputy Director of Communications, of the New York State Division of Alcoholic Beverage Control.

228.    Ms. Morella advised Mr. DeChiaro that she had not received his FOIL request, and suggested he send another one.

229.    In accord with her request, on Friday April 11, 2008, Mr. DeChiaro sent a second FOIL request to the Liquor Authority.

230.    A true copy of Mr. DeChiaro's second FOIL request is annexed hereto as Exhibit "L"

231.    Later that same day, Ms. Morella contacted Mr. DeChiaro by telephone, and advised him that she had received his FOIL request.

232.    In doing so, Ms. Morella also <u>explicitly advised Mr. DeChiaro that she would not be able to provide Mr. DeChiaro with copies of the communications which the State Liquor Authority had received from the Town, and the defendants named herein.</u>

233.    In response to her assertion, Mr. DeChiaro reiterated his request, as contained in his formal FOIL request, that the Liquor Authority provide him with copies of those precise documents.

234.    Five (5) days later, Mr. DeChiaro received an e-mail from Ms. Morella, wherein she indicated to Mr. DeChiaro that the SLA files which contained the communications from the Town which he had requested, had gone missing.

235.    More specifically, Ms. Morella advised Mr. DeChiaro:

> "We have been unable to locate the physical file for either items in your request below.  We have conducted a detailed search for them both over the last few days and yielded nothing new at this point

236.    Annexed hereto as Exhibit "M" is a true copy of Ms. Morella's e-mail to Mr. DeChiaro wherein she articulates same.

237.    Upon information and belief, it was not by sheer coincidence that:

(a)    hard copies of all communications between the defendants, and both the County and State agencies, were removed from all of the towns files and records, and

(b)    The Town Supervisor, defendant Linda Cooper intentionally deleted all electronically stored copies of such communication from the Town computers hard drive, and

(c)    upon Mr. DeChiaro's attempt to obtain copies from the SLA, the SLA's file which contained same "went missing" within five days after Mr. DeChiaro insisted that they give copies of the communications which the SLA had received from the defendants, over their SLA's explicitly stated reluctance to turn over same to Mr. DeChiaro.

44

238.    Upon information and belief, all of these actions in destroying and concealing public records were undertaken by the defendants, and by others acting under the influence of the defendants, in a calculated effort to eliminate, and or conceal from Mr. DeChiaro, evidence of the defendants' conspiracy to deliberately violate the plaintiffs' rights, as described herein.

239.    Upon information and belief, *but for* the plaintiffs' refusal to pay one or more of the defendants political graft monies, in accord with requests which had been made to the plaintiffs for same, the defendants would not have retaliated against, and deliberately punished, the plaintiffs, as described herein.

## EACH OF THE DEFENDANTS ARE PERSONS WHO ACTED UNDER COLOR OF STATE LAW

### *Defendant Nicholas Bianco is a "person" who acted under color of state law within the meaning of 42 U.S.C. § 1983*

240.    While intentionally engaging in the improper and unlawful conduct described herein, defendant BIANCO was clothed with the authority of local law as a Councilman of the Town of Yorktown and a Member of the Town Board.

241.    The wrongs committed by the conspiracy of all of the defendants, including defendant BIANCO, and the injuries sustained by the plaintiffs as a result thereof, were rendered possible only because of the veil of local authority lodged in defendant BIANCO by virtue of his office as a Member of the Town Board, which was expressly created under local law.

242.    The wrongs committed by defendant BIANCO constituted a misuse of the power possessed by defendant BIANCO by virtue of local law and defendant BIANCO's capacity and position as Councilman and a Member of the Town Board.

45

243.    The wrongs committed by defendant BIANCO were planned, orchestrated and committed during the regular business hours of defendant BIANCO's official office and within the hours during which defendant BIANCO is responsible for fulfilling his official duties as Councilman and a Member of the Town Board.

244.    In committing the wrongs described herein, defendant BIANCO held himself out to be acting in his capacity as Councilman and a Member of the Yorktown Town Board, and was viewed to be acting in such capacity by the persons whom defendant BIANCO influenced as described herein.

245.    Accordingly, in committing the acts described herein, defendant BIANCO was a person acting under color of state law within the purview of 42 U.S.C. § 1983.

*Defendant Louis Campisi is a "person" who acted under
color of state law within the meaning of 42 U.S.C. § 1983*

246.    While intentionally engaging in the improper and unlawful conduct described herein, defendant CAMPISI was clothed with the authority of local law as a Councilman of the Town of Yorktown and a Member of the Town Board.

247.    The wrongs committed by the conspiracy of all of the defendants, including defendant CAMPISI, and the injuries sustained by the plaintiffs as a result thereof, were rendered possible only because of the veil of local authority lodged in defendant CAMPISI by virtue of his office as a Member of the Town Board, which was expressly created under local law.

248.    The wrongs committed by defendant CAMPISI constituted a misuse of the power possessed by defendant CAMPISI by virtue of local law and defendant CAMPISI's capacity and position as Councilman and a Member of the Town Board.

249.    The wrongs committed by defendant CAMPISI were planned, orchestrated and committed during the regular business hours of defendant CAMPISI's official office and within the hours during which defendant CAMPISI is responsible for fulfilling his official duties as Councilman and a Member of the Town Board.

250.    In committing the wrongs described herein, defendant CAMPISI held himself out to be acting in his capacity as Councilman and a Member of the Yorktown Town Board, and was viewed to be acting in such capacity by the persons whom defendant CAMPISI influenced as described herein.

251.    Accordingly, in committing the acts described herein, defendant CAMPISI was a person acting under color of state law within the purview of 42 U.S.C. § 1983.

*Defendant Linda Cooper is a "person" who acted under*
*color of state law within the meaning of 42 U.S.C. § 1983*

252.    While intentionally engaging in the improper and unlawful conduct described herein, defendant COOPER was clothed with the authority of local law as the Supervisor of the Town of Yorktown and a Member of the Town Board.

253.    The wrongs committed by the conspiracy of all of the defendants, including defendant COOPER, and the injuries sustained by the plaintiffs as a result thereof, were rendered possible only because of the veil of local authority lodged in defendant COOPER by virtue of her office as Town Supervisor and Member of the Town Board, which were expressly created under local law.

254.     The wrongs committed by defendant COOPER constituted a misuse of the power possessed by defendant COOPER by virtue of local law and defendant COOPER's capacity and position as Supervisor and Member of the Town Board.

255.     The wrongs committed by defendant COOPER were planned, orchestrated and committed during the regular business hours of defendant COOPER's official office and within the hours during which defendant COOPER is responsible for fulfilling her official duties as Supervisor and Member of the Town Board.

256.     In committing the wrongs described herein, defendant COOPER held herself out to be acting in her capacity as Supervisor and Member of the Yorktown Town Board, and was viewed to be acting in such capacity by the persons whom defendant COOPER influenced as described herein.

257.  Accordingly, in committing the acts described herein, defendant COOPER was a person acting under color of state law within the purview of 42 U.S.C. § 1983.

### *Defendant Bruce Barber  is a "person" who acted under color of state law within the meaning of 42 U.S.C. § 1983*

258.     While intentionally engaging in the improper and unlawful conduct described herein, defendant BARBER was clothed with the authority of local law as the Environmental Code Officer for the Town of Yorktown.

259.    The wrongs committed by the conspiracy of all of the defendants, including defendant BARBER, and the injuries sustained by the plaintiffs as a result thereof, were rendered possible only because of the veil of local authority lodged in defendant BARBER by virtue of his office the Environmental Code Officer for the Town of Yorktown, which was expressly created under local law.

260.    The wrongs committed by defendant BARBER constituted a misuse of the power possessed by defendant BARBER by virtue of local law and defendant BARBER's capacity and position as the Environmental Code Officer for the Town of Yorktown.

261.    The wrongs committed by defendant BARBER were planned, orchestrated and committed during the regular business hours of defendant BARBER's official office and within the hours during which defendant BARBER is responsible for fulfilling his official duties as the Environmental Code Officer for the Town of Yorktown.

262.    In committing the wrongs described herein, defendant BARBER held himself out to be acting in his capacity as the Environmental Code Officer for the Town of Yorktown, and was viewed to be acting in such capacity by the persons whom defendant BARBER influenced as described herein.

263.  Accordingly, in committing the acts described herein, defendant BARBER was a person acting under color of state law within the purview of 42 U.S.C. § 1983.

*Defendant John Tegeder is a "person" who acted under*
*color of state law within the meaning of 42 U.S.C. § 1983*

264.    While intentionally engaging in the improper and unlawful conduct described

herein, defendant TEGEDER was clothed with the authority of local law as The Director of

Planning of the Town of Yorktown

265.    The wrongs committed by the conspiracy of all of the defendants, including

defendant TEGEDER, and the injuries sustained by the plaintiffs as a result thereof, were rendered

possible only because of the veil of local authority lodged in defendant TEGEDER by virtue of his

office The Director of Planning of the Town of Yorktown

266.    The wrongs committed by defendant TEGEDER constituted a misuse of the power

possessed by defendant TEGEDER by virtue of local law and defendant TEGEDER's capacity and

position as The Director of Planning of the Town of Yorktown

267.    The wrongs committed by defendant TEGEDER were planned, orchestrated and

committed during the regular business hours of defendant TEGEDER's official office and within

the hours during which defendant TEGEDER is responsible for fulfilling his official duties as The

Director of Planning of the Town of Yorktown

268.    In committing the wrongs described herein, defendant TEGEDER held himself out

to be acting in his capacity as The Director of Planning of the Town of Yorktown., and was viewed

to be acting in such capacity by the persons whom defendant TEGEDER influenced as described

herein.

269.    Accordingly, in committing the acts described herein, defendant TEGEDER was a

person acting under color of state law within the purview of 42 U.S.C. § 1983.

50

*Defendant William D. Gregory is a "person" who acted under*
*color of state law within the meaning of 42 U.S.C. § 1983*

270.    While intentionally engaging in the improper and unlawful conduct described

herein, defendant GREGORY was clothed with the authority of local law as a Building Inspector

for the Town of Yorktown.

271.    The wrongs committed by the conspiracy of all of the defendants, including

defendant GREGORY, and the injuries sustained by the plaintiffs as a result thereof, were rendered

possible only because of the veil of local authority lodged in defendant GREGORY by virtue of his

office as Building Inspector for the Town of Yorktown, which was expressly created under local

law.

272.    The wrongs committed by defendant GREGORY constituted a misuse of the power

possessed by defendant GREGORY by virtue of local law and defendant GREGORY's capacity

and position as the Building Inspector for the Town of Yorktown..

273.    The wrongs committed by defendant GREGORY were planned, orchestrated and

committed during the regular business hours of defendant GREGORY's official office and within

the hours during which defendant GREGORY is responsible for fulfilling his official duties as the

Building Inspector for the Town of Yorktown.

274.    In committing the wrongs described herein, defendant GREGORY held himself out

to be acting in his capacity as the Building Inspector for the Town of Yorktown, and was viewed to

be acting in such capacity by the persons whom defendant GREGORY influenced as described

herein.

51

275.  Accordingly, in committing the acts described herein, defendant GREGORY was a person acting under color of state law within the purview of 42 U.S.C. § 1983.

## THE TOWN IS A "PERSON" LIABLE TO THE PLAINTIFFS UNDER 42 U.S.C. § 1983 BECAUSE THE DEFENDANTS' ACTIONS WERE UNDERTAKEN PURSUANT TO POLICY AND/OR CUSTOM

276.  At all relevant times mentioned herein, defendants were all official board members of the Town of Yorktown and as such, were authorized to review and act upon applications relating to the development and use of properties within the Town.

277.  These defendants were clothed with the authority to make official government policy, and laws, on behalf of the Town of Yorktown, and abide by same.  As such, their wrongful actions in relation to plaintiffs' rights represent the Town's official governmental policy.

278.  Because the actions of defendants regarding plaintiffs' rights constituted the TOWN's official policy, the TOWN is also a "person" liable for their wrongful actions within the purview of 42 U.S.C. § 1983.

*Defendant GEORGE OROS  is a "person" who acted under color of state law within the meaning of 42 U.S.C. § 1983*

279.  While intentionally engaging in the improper and unlawful conduct described herein, defendant OROS was clothed with the authority of local law as a Legislator, on the Board of Legislators of The County of Westchester.

52

280.    The wrongs committed by the conspiracy of all of the defendants, including defendant OROS, and the injuries sustained by the plaintiffs as a result thereof, were rendered possible only because of the veil of local authority lodged in defendant OROS by virtue of his office as a Westchester County Legislator which was expressly created under local law.

281.    The wrongs committed by defendant OROS constituted a misuse of the power possessed by defendant OROS by virtue of local law and defendant OROS' capacity and position as a Westchester County Legislator.

282.    The wrongs committed by defendant OROS were planned, orchestrated and committed during the regular business hours of defendant OROS' official office and within the hours during which defendant OROS is responsible for fulfilling his official duties as a Westchester County Legislator.

283.    In committing the wrongs described herein, defendant OROS held himself out to be acting in his capacity as Councilman and a Westchester County Legislator, and was viewed to be acting in such capacity by the persons whom defendant OROS influenced as described herein.

284.    Accordingly, in committing the acts described herein, defendant OROS was a person acting under color of state law within the purview of 42 U.S.C. § 1983.

## CLAIMS FOR RELIEF

## COUNT ONE

### VIOLATION OF PLAINTIFFS' CLEARLY ESTABLISHED RIGHT TO PETITION GOVERNMENT FOR THE REDRESS OF GRIEVANCES

(Right To Petition For Inclusion Into An Agricultural District)

285.    The plaintiffs repeat and reiterate the allegations set forth within paragraphs "1" through "284" herein above, with the same force and effect as if fully set forth at length herein.

286.    As set forth herein, the defendants violated the plaintiffs' clearly established right to petition government for the redress of grievances, as protected under the First Amendment to The United States Constitution, and applicable state and local laws.

287.    At all times described herein the plaintiffs' were, and remain, possessed of a clearly established right to petition government for the redress of grievances, as is explicitly afforded protection under the First Amendment to The United States Constitution.

288.    At all times described herein, the plaintiffs possessed clearly established rights to petition the County of Westchester for the inclusion of their properties within the County's Agricultural District which has been established under New York State Agricultural and Markets Law, Article 25-AA.

289.    The plaintiffs' right to petition the County for admission of their real property into the County's Agricultural District, constitutes a petition submitted to local government for the redress of grievances, and as such, the plaintiffs rights to petition in such manner were, and are, protected under the First Amendment to the United States Constitution.

290.    Because the defendants sought to punish the plaintiffs for having exercised their right to petition County government for inclusion of their federally regulated farming activities into an Agricultural District, which, if granted, would subject the defendants to New York State oversight over their attempts to restrict the plaintiffs use of their land, the defendants' retaliatory and concerted attacks struck at the very heart of the plaintiffs' First Amendment rights.

291.    Pared to its essence, the defendants have prevented the plaintiffs from securing protections under New York State law, which were, in fact, specifically intended to protect the plaintiffs from the defendants, and more specifically, to prohibit the defendants from "unreasonable interfering" with the plaintiff's farming operations.

292.    Unreasonably restricting and interfering with the plaintiffs' farming operations is precisely what the defendants *have* been doing, and which they can continue to do, free from state intended oversight by the New York State Commissioner of Agriculture and Markets, so long as the defendants can continue to prevent the plaintiffs' application, to be included in the County's Agricultural District, from being granted by the County.

293.    Once the plaintiffs' application were to be granted by the County, New York State law would explicitly bar the defendants from unreasonably interfering with the plaintiffs efforts to operate their vineyard and winery operation as a farming under New York Agriculture and Markets Law Article 25-AA.

294.    In the event that the defendants thereafter proceeded to interfere with the plaintiffs operations, the plaintiffs would possess a statutorily created right to request that the Commissioner of Agriculture and Markets order the defendant to cease such interference, as the Commissioner is authorized to do under New York State law.

295.    In addition, the Commissioner would be empowered to commence an action within the New York State Supreme Court to secure a Court order permanently enjoining the defendants from engaging in such unreasonable interference with the plaintiffs farming operations.

296.    Being well aware of these facts, upon learning that the plaintiffs were attempting to secure admission into the County of Westchester's already-existing Agricultural District, to secure these protections which would be afforded the plaintiffs under New York State Law, the defendants actively conspired to, and did, take affirmative actions to delay and ultimately defeat the plaintiffs' application, and to retaliate against and punish the plaintiffs the act of having filed such application.

297.    The defendants have successfully prevented the plaintiffs from securing such inclusion by the County, by deliberately, arbitrarily and unlawfully interfering with such application by:

(a)    "calling-in political favors" with third persons, and enlisting their assistance to unlawfully influence County representatives who are vested with decision making authority over the plaintiffs application, and

(b)    knowingly providing false information to County representatives who are vested with decision making authority in granting or denying relating to plaintiffs' applications in an underhanded effort to persuade them to deny the plaintiffs' application based upon such false information, and

(c)    trumping-up unfounded and false code violations, and concomitantly positing to the County that the plaintiffs application should be denied based upon the existence of the inherently baseless violations.

56

298.    The statements made by defendant BIANCO indicate his clear intent to deprive Mr. DeChairo of his statutorily created right to petition for inclusion of his property into the County's Agricultural District, and to retaliate against Mr. DeChiaro and influence the other defendants to retaliate against Mr. DeChiaro, in violation of Mr. DeChiaros' lawful exercise of his First Amendment rights.

299.    It is obvious from the chronology of events that the defendants' acts were motivated by the defendants' personal animus against Mr. DeChiaro, and that the defendants have delayed and defeated both the plaintiffs application for Agricultural District inclusion, and the plaintiffs State application for a liquor license, and have further caused the denial of other land use applications which the plaintiffs have submitted to the Town, in unjustifiable retaliation for the plaintiffs' having lawfully exercised their First Amendment rights.

300.    As a result of the defendants actions, the plaintiffs have been damaged by being unable to use their properties in a manner by which they are legally permitted to do, as a matter of right, and by the loss of income and profits from being unable to use, derive a benefit from, and/or profit from the use of the land.

301.    All of the injuries described herein above were actually and proximately caused by the concerted acts of the defendants described herein.

302.    The plaintiffs have no adequate remedy under state law to secure redress for such U.S. Constitutional violations

303.    All of the aforementioned actions on the part of the defendants were undertaken by the defendants who were, at all relevant times described herein, acting under color of state law.

304.   By intentionally retaliating against the plaintiffs for having lawfully filed the petition described herein, and preventing the plaintiffs from securing various land use permits and licenses as described herein, the defendants' actively and maliciously deprived the plaintiffs of rights privileges and immunities as guaranteed under the First Amendment of the United States Constitution, and as such, each of the defendants are personally liable to the plaintiffs pursuant to 42 U.S.C. §1983.

305.   The actions of the defendants were performed with actual spite, malice, and an affirmative intent to injure the plaintiffs, and were calculated efforts which the defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the plaintiffs rights.

306.   In view of the forgoing, a substantial award of punitive damages against each of the individually named defendants is warranted.

## COUNT TWO

**VIOLATION OF PLAINTIFFS' CLEARLY
ESTABLISHED RIGHT TO PETITION GOVERNMENT
FOR THE REDRESS OF GRIEVANCES**

(Right to Petition For Review of Public Records Under FOIL)

307.    The plaintiffs repeat and reiterate the allegations set forth within paragraphs "1"

through "306" herein above, with the same force and effect as if fully set forth at length herein.

308.    At all times described herein the plaintiffs were, and remain, possessed of a clearly

established right to petition government for the redress of grievances, as is explicitly afforded

protection under the First Amendment to The United States Constitution.

309.    At all times described herein, under New York State Public Officers Law, Article 6,

§84-§90, commonly known as New York Freedom of Information Law (FOIL), the plaintiffs

possessed clearly established rights to petition local governments, including the Town of

Yorktown, County of Westchester, and State of New York, for access to and inspection of, public

Town, County and State records.

310.    The plaintiffs' rights to petition the Town of Yorktown, County of Westchester and

State of New York, for access to review and inspect Town, County and State records constitute

petitions to government for the redress of grievances, and as such, the plaintiffs rights are protected

under, and fall within the purview of, the First Amendment to the United States Constitution.

311.    To ensure that local governments, such as the Town of Yorktown, maintain such records so that they are available for review under FOIL, New York State Open Meetings law imposes, and at all relevant times described herein imposed upon the defendants, a statutory mandate to maintain such records, and to further maintain an inventory of same.

312.    The statutory requirement imposed under New York State law concomitantly mandated, at all times described herein, that the defendants refrain from deliberately destroying or deleting, Town of Yorktown records pertaining to the plaintiffs' properties and applications.

313.    By deliberately concealing, and affirmatively destroying the Town's public records concerning the plaintiffs' properties, the defendants engaged in a calculated effort to destroy evidence of their actions described herein, and to preempt against the plaintiffs' exercise of their rights to inspect and copy such records under state law.

314.    Pared to its essence, the defendants have prevented the plaintiffs from exercising their right to petition government for the redress of grievances, by permanently depriving the plaintiff of any opportunity to petition the Town of Yorktown for the opportunity to inspect and review such records, which have been deliberately destroyed by the defendants herein, or under their direction.

315.    The chronology of events described herein evidence the fact that the defendants' acts in the destruction and concealment of records were motivated by the defendants' desire to conceal each of their respective actions taken in furtherance of their conspiracy against Mr. DeChiaro, as described herein.

316.    All of the aforementioned actions on the part of the defendants were undertaken by the defendants who were, at all relevant times described herein, acting under color of state law.

317.    As a direct result of the defendants violations of the plaintiffs' rights, the plaintiffs have sustained monetary damages which continue to accrue.

318.    The plaintiffs have no adequate remedy under state law to secure redress for such U.S. Constitutional violations.

319.    By engaging in conduct which was specifically calculated to deprive the plaintiffs of any opportunity to exercise their right to petition for the redress of grievances, in the manner described herein, the defendants' actively and maliciously deprived the plaintiffs of rights privileges and immunities as guaranteed under the First Amendment of the United States Constitution, and as such, each of the defendants are personally liable to the plaintiffs pursuant to 42 U.S.C. §1983.

320.    The actions of the defendants were performed with actual spite, malice, and an affirmative intent to injure the plaintiffs, and were calculated efforts which the defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the plaintiffs U.S. Constitutional rights.

321.    In view of the forgoing, a substantial award of punitive damages against each of the individually named defendants is warranted.

61

## COUNT THREE

### VIOLATION OF PLAINTIFFS' CLEARLY
### ESTABLISHED RIGHT TO PETITION GOVERNMENT
### FOR THE REDRESS OF GRIEVANCES

(Right To Petition For a New York State Liquor License)

323.     The plaintiffs repeat and reiterate the allegations set forth within paragraphs "1"

through "322" herein above, with the same force and effect as if fully set forth at length herein.

324.     As set forth herein, the defendants violated the plaintiffs' clearly established right to

petition government for the redress of grievances, as protected under the First Amendment to The

United States Constitution, and applicable state and local laws.

325.     At all times described herein the plaintiff's were, and remain, possessed of a clearly

established right to petition government for the redress of grievances, as is explicitly afforded

protection under the First Amendment to The United States Constitution.

326.     At all times described herein, the plaintiffs possessed clearly established rights to

petition the State of New York to obtain a state liquor license, which the plaintiffs are legally

required to obtain under state law, to operate their intended vineyard and winery operation.

327.     The plaintiffs' right to petition the State to obtain a liquor license constitutes a

petition submitted to local government for the redress of grievances, and as such, the plaintiffs

rights to petition in such manner were, and are, protected under the First Amendment to the United

States Constitution.

62

328.     By intervening, and asserting unlawful influence upon State representatives, and thereby inducing them to deny the plaintiffs' application for a liquor license, for the actual purpose of punishing the plaintiff for having filed a related application for inclusion of their federally regulated farming activities into an Agricultural District, the defendants have violated the plaintiffs rights to petition government for the redress of grievances.

329.     It is obvious from the chronology of events that the defendants' acts in causing the New York State Liquor Authority to deny the plaintiffs' application for a liquor license, were motivated by the defendants' personal animus against Mr. DeChiaro, and that the defendants have defeated the plaintiffs State application for a liquor license, and have further caused the denial of other land use applications which the plaintiffs have submitted to the Town, in unjustifiable retaliation for the plaintiffs' having lawfully exercised their First Amendment rights.

330.     As a result of the defendants actions, the plaintiffs have been damaged by being unable to use their properties in a manner by which they are legally permitted to do, as a matter of right, and by the loss of income and profits from being unable to use, derive a benefit from, and/or profit from the use of the land.

331.     All of the injuries described herein above were actually and proximately caused by the concerted acts of the defendants described herein.

332.     The plaintiffs have no adequate remedy under state law to secure redress for such U.S. Constitutional violations

333.     All of the aforementioned actions on the part of the defendants were undertaken by the defendants who were, at all relevant times described herein, acting under color of state law.

63

334.    By intentionally retaliating against the plaintiffs for having lawfully filed the petition described herein, and preventing the plaintiffs from securing various land use permits and licenses as described herein, the defendants' actively and maliciously deprived the plaintiffs of rights privileges and immunities as guaranteed under the First Amendment of the United States Constitution, and as such, each of the defendants are personally liable to the plaintiffs pursuant to 42 U.S.C. §1983.

335.    The actions of the defendants were performed with actual spite, malice, and an affirmative intent to injure the plaintiffs, and were calculated efforts which the defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the plaintiffs U.S. Constitutional rights.

336.    In view of the forgoing, a substantial award of punitive damages against each of the individually named defendants is warranted.

## COUNT FOUR

### DUE PROCESS CLAIMS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

(Procedural Due Process - 42 U.S.C. §1983)

337.    The plaintiffs repeat and reiterate the allegations set forth within paragraphs "1" through "336" herein above, with the same force and effect as if fully set forth at length herein.

338.    At all times described herein, the plaintiffs possessed the clearly established property rights, under Federal, New York State, and Town Laws, to purchase, own and lease real properties, the right to enjoy their properties without unlawful deprivation of their use or enjoyment, to employ such properties in the manner of their choosing in accord with Federal, State and Town Laws, and to apply for any permits requisite to or necessary for such uses, without unlawful and arbitrary interference from the defendants.

339.    Under New York State laws, at all times described herein, the plaintiffs possessed clearly established property rights, and liberty interests, to own and lease real properties, to employ such properties in the manner of their choosing, and to apply for any permits requisite to such uses, without unlawful and arbitrary interference and unreasonable delay from the defendants.

340.    Under New York State law, the plaintiffs' property rights associated with their properties include, but are not limited to:

(a)    The plaintiffs' statutorily provided right to apply for inclusion of the plaintiffs real properties into Westchester County's Agricultural District, and

65

(b)     The plaintiffs statutorily provided right to apply for a New York

State liquor license to enable them use to their properties for the

operation of a vineyard and winery, and

(c)     The plaintiffs statutorily provided right to apply for a Certificate of

Occupancy, for use of their building within which to operate their

winery.

341.    Within the veil of liberty interests existing under New York State Laws, the

plaintiffs rights encompassed, among other things:

(a)     The right to seek to pursue a farming operation upon their real

properties, and

(b)     The right to apply for, and obtain inclusion of their real properties

into the Westchester Agricultural District, for the purpose of

securing New York State oversight and protection over their farming

operation, and

(c)     The right to apply for, and obtain a liquor license from the New York

State Liquor Authority for their combined vineyard and farming

operation, and

(d)     The right to seek to produce wine from grapes grown upon their

properties and to market same as being produced within the federally

certified Hudson River Region, as permitted under federal

regulations, and

66

(e) The right to engage in such uses and to file such land use permits as may be required for such use, free from attacks by local authorities, in the form of false complaints and proceedings for baseless zoning or building code violations, and

(f) The right to exercise all of the above-referenced property rights, liberties and privileges, free from unlawful demands from local authorities, to pay political graft monies, under threat that a failure to pay such graft monies to local officials will result in such local government officials preventing or defeating a property owner from successfully exercising their rights, or from using their property in the manner they see fit, or desire.

342. As described herein above, the defendants herein deliberately deprived the plaintiffs of all of the above-referenced property rights and liberty interests, by:

(a) Preventing the plaintiffs from pursuing a farming operation upon their real properties, and

(b) Preventing the plaintiffs from securing inclusion of their real properties into the County's Agricultural District, by depriving the plaintiffs of a "fair procedure" in the County's consideration of such application, through the exercise of unlawful and or undue political influence over County representatives, and deliberately providing false and misleading information to County representatives, and

67

(c)    Preventing the plaintiffs from obtaining a liquor license, by depriving
the plaintiffs of a "fair procedure" in the State Liquor Authority's
consideration of the plaintiffs' application for same,  through the
exercise of unlawful and or undue political influence over
State representatives, and deliberately providing false and misleading
information to State representatives, and

(d)    Preventing the plaintiffs from producing wine from grapes grown
upon their properties and to marketing same as being produced
within the federally certified Hudson River Region, as permitted
under federal regulations, and

(e)    Deliberately interfering with, and preventing the plaintiffs from
engaging in their desired use of their properties by causing the filing of false
complaints and proceedings for baseless zoning or building
code violations against the plaintiffs, and

(f)    Further depriving the plaintiffs of fair procedures, in refusing to
process or grant use permits and/or land related approvals required
under Town of Yorktown regulations or ordinances, the processing
or granting of which, the plaintiff is entitled to as a matter of right,

(g)    Tendering unlawful requests that the plaintiffs pay the defendants political
graft monies, the failure to pay which having precipitated retaliatory attacks
by the defendants against the plaintiffs which have included, but have not
been limited to, such defendants, while acting as local government officials,
preventing and defeating the plaintiffs, as property owners from successfully
exercising their above referenced rights, from obtaining land use permits
and/or licenses necessary for their desired use, and thereby completely

68

preventing the plaintiffs from using their properties in the manner they see fit, or desire.

343.    The defendants' conspired actions of depriving the plaintiffs of any fair procedure with respect to the plaintiffs various applications and land use permits, were driven by the defendants personal animus against the plaintiffs and for the purpose of punishing the plaintiffs for their lawful desire to operate a vineyard and winery and pursuit of causing such farming operation to be included into the County of Westchester's Agricultural District.

344.    In effectuating such deprivations, while simultaneously engaging in calculated, deliberate and successful efforts to ensure that the plaintiffs were deprived of due process of law, the defendants violated the plaintiffs right to procedural due process as guaranteed under the Fourteenth Amendment of the United States Constitution; as such, each of the defendants are individually liable to the plaintiffs pursuant to 42 U.S.C. § 1983.

345.    As set forth more fully above, the defendants' actions unlawfully deprived the plaintiffs of its property and liberty rights in violation of procedural due process as guaranteed under the Fourteenth Amendment of the United States Constitution.

346.    As discussed herein above, each of the individually named defendants herein acted in furtherance of their conspiracy, took an active part in, and/or ratified a consistent and systematic pattern of misconduct which was intentionally and maliciously intended by the defendants to delay and ultimately defeat the plaintiffs' various applications in violation of the plaintiffs' property rights, in wilful violation of the plaintiffs U.S. Constitutional rights.

347.    Because New York courts do not provide a judicial mechanism with which to challenge the defendants' deliberate and arbitrary abuses of governmental power, the plaintiffs were not afforded a reasonable opportunity to contest the actions of the defendants which effectively deprived the plaintiffs of their liberty and property rights.

348.    Having substantially interfered with and/or deprived the plaintiffs of their liberty and property interests without having afforded the plaintiffs any opportunity at a meaningful time and meaningful manner within which to review the defendants' concerted behavior, the defendants violated the plaintiffs' right to procedural due process as guaranteed to the plaintiffs under the Fourteenth Amendment of the U.S. Constitution.

349.    As a result of the aforesaid defendants' violation of plaintiffs' procedural due process rights, the plaintiffs have been damaged by being unable to use the property in a manner by which they were permitted to do as a matter of law and right, and by the loss of income and profits from being unable to use, derive a benefit from, and/or profit from the use of the land.

350.    All of the injuries described herein above were actually and proximately caused by the concerted acts of the defendants described herein.

351.    The aforesaid defendants' violation of plaintiff's due process rights were made under color of state law, which constitutes "state action" under 42 U.S.C. § 1983.

352.    Having deliberately violated the plaintiffs Constitutionally protected rights, and concomitantly having caused the plaintiffs to sustain monetary damages as a result thereof each of the defendants are personally liable to the plaintiffs, and the plaintiffs are entitled to secure relief against the defendants, pursuant to 42 U.S.C. §1983.

70

353.    The actions of the defendants were performed with actual spite, malice, and an affirmative intent to injure the plaintiffs, and were calculated efforts which the defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the plaintiffs U.S. Constitutional rights.

354.    In view of the forgoing, a substantial award of punitive damages against each of the individually named defendants is warranted.

## COUNT FIVE

### DUE PROCESS CLAIMS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

(Substantive Due Process - 42 U.S.C. §1983)

355.    The plaintiffs repeat and reiterate the allegations set forth within paragraphs "1" through "354" herein above, with the same force and effect as if fully set forth at length herein.

356.    At all times described herein, the plaintiffs were vested of constitutionally protected property rights and liberty interests, as set forth herein above.

357.    As detailed herein above, the defendants arbitrarily, capriciously and deliberately deprived the plaintiffs of such property rights and liberty interests, and engaged in a pattern of insidious, spiteful and malicious conduct which was oppressive in an constitutional sense, in violation of the plaintiffs rights to substantive due process, as guaranteed the plaintiffs under the Fourteenth Amendment to the United States Constitution.

358.    As a result of the aforesaid defendants' violation of plaintiffs' substantive due process rights, the plaintiffs have been damaged by being unable to use the property in a manner by which they were permitted to do as a matter of law and right, and by the loss of income and profits from being unable to use, derive a benefit from, and/or profit from the use of the land.

359.    All of the injuries described herein above were actually and proximately caused by the concerted acts of the defendants described herein.

360.    The aforesaid defendants' violation of plaintiff's due process rights were made under color of state law, which constitutes "state action" under 42 U.S.C. § 1983.

72

361.    Having deliberately violated the plaintiffs Constitutionally protected rights, and concomitantly having caused the plaintiffs to sustain monetary damages as a result thereof each of the defendants are personally liable to the plaintiffs, and the plaintiffs are entitled to secure relief against the defendants, pursuant to 42 U.S.C. §1983.

362.    The actions of the defendants were performed with actual spite, malice, and an affirmative intent to injure the plaintiffs, and were calculated efforts which the defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the plaintiffs U.S. Constitutional rights.

363.    In view of the forgoing, a substantial award of punitive damages against each of the individually named defendants is warranted.

## COUNT SIX

## THE DEFENDANTS CONSPIRACY TO VIOLATE
## THE PLAINTIFFS' CIVIL RIGHTS

(Conspiracy Claim - 42 U.S.C. §1985)

364.    The plaintiffs repeat and reiterate the allegations set forth within paragraphs "1"

through "363" herein above, with the same force and effect as if fully set forth at length herein.

365.    Each and all of the defendants conspired with and among each other in order to

violate the plaintiffs' rights, under First and Fourteenth Amendment, as described herein

366.    Acting under the direction of, and in conspiracy with, defendants BIANCO,

CAMPISI and COOPER, defendants BARBER, TEGEDER, GREGORY and OROS conspired

with the others to unlawfully deprive the plaintiffs, either directly or indirectly, of their first

amendment rights to petition the government for the redress of grievances, of their property and

liberty rights under the due process clause and their rights to equal protection under the law as

guaranteed under the Fourteenth Amendment of the United States Constitution.

367.    In furtherance of the conspiracy, as described herein above, the defendants engaged

in a consistent and systematic pattern of misconduct which was intentionally and maliciously

intended by the defendants to delay and ultimately defeat the plaintiffs' various applications in

violation of the plaintiffs' constitutional rights.

368.    The aforesaid defendants' violation of plaintiffs' constitutional rights were made

under color of state law, which constitutes "state action" under 42 U.S.C. § 1985.

369.    The defendants' conspiracy to deprive the plaintiffs of their first amendment rights and their due process and equal protection rights under the Fourteenth Amendment to the United States Constitution is in violation of 42 U.S.C. § 1985.

370.    In carrying out their conspiracy against the plaintiffs, the defendants engaged in conduct which was performed with actual spite, malice, and an affirmative intent to injure the plaintiffs, and were calculated efforts which the defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the plaintiffs U.S. Constitutional rights.

371.    In view of the forgoing, a substantial award of punitive damages against each of the individually named defendants is warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully demand the following relief:

## COUNT ONE

### VIOLATION OF PLAINTIFFS' CLEARLY ESTABLISHED RIGHT TO PETITION GOVERNMENT FOR THE REDRESS OF GRIEVANCES

(Right To Petition For Inclusion Into An Agricultural District)

1. For compensatory damages against all defendants, jointly and severally, in the amount of Five Million dollars ($5,000,000.00) or in such an amount proven at trial;

2. For punitive damages against all individually named defendants, jointly and severally; in the amount of Twenty Five Million dollars ($25,000,000.00) or in such an amount awarded at trial;

3. For reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988(b);

4. For any and all expert fees incurred by the plaintiff, pursuant to 42 U.S.C. §1988(c);

5. For injunctive relief enjoining the defendants from interfering further with the plaintiffs efforts to secure any form of approvals or licenses associated with the plaintiffs intended use of their properties, from County, State or other governmental authorities, and an Order directing the defendants to process the plaintiffs' application(s) lawfully, properly, and in conjunction with existing Town rules and ordinances, and in accord the normal procedure applied to all other property owners and/or tenants applicants within the Town of Yorktown; and

6. For such other and further relief as this court may deem just and proper.

76

## COUNT TWO

### VIOLATION OF PLAINTIFFS' CLEARLY ESTABLISHED RIGHT TO PETITION GOVERNMENT FOR THE REDRESS OF GRIEVANCES

(Right to Petition For Review of Public Records Under FOIL)

1. For compensatory damages against all defendants, jointly and severally, in the amount of One Million dollars ($1,000,000.00) or in such an amount proven at trial;

2. For punitive damages against all individually named defendants, jointly and severally; in the amount of Twenty Five Million dollars ($25,000,000.00) or in such an amount awarded at trial;

3. For reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988(b);

4. For any and all expert fees incurred by the plaintiff, pursuant to 42 U.S.C. §1988(c);

5. For injunctive relief enjoining the defendants from interfering further with the plaintiffs efforts to secure any form of approvals or licenses associated with the plaintiffs intended use of their properties, from County, State or other governmental authorities, and an Order directing the defendants to process the plaintiffs' application(s) lawfully, properly, and in conjunction with existing Town rules and ordinances, and in accord the normal procedure applied to all other property owners and/or tenants applicants within the Town of Yorktown; and

6. For such other and further relief as this court may deem just and proper.

## COUNT THREE

### VIOLATION OF PLAINTIFFS' CLEARLY ESTABLISHED RIGHT TO PETITION GOVERNMENT FOR THE REDRESS OF GRIEVANCES

(Right To Petition For a New York State Liquor License)

1. For compensatory damages against all defendants, jointly and severally, in the amount of Five Million dollars ($5,000,000.00) or in such an amount proven at trial;

2. For punitive damages against all individually named defendants, jointly and severally; in the amount of Twenty Five Million dollars ($25,000,000.00) or in such an amount awarded at trial;

3. For reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988(b);

4. For any and all expert fees incurred by the plaintiff, pursuant to 42 U.S.C. §1988(c);

5. For injunctive relief enjoining the defendants from interfering further with the plaintiffs efforts to secure any form of approvals or licenses associated with the plaintiffs intended use of their properties, from County, State or other governmental authorities, and an Order directing the defendants to process the plaintiffs' application(s) lawfully, properly, and in conjunction with existing Town rules and ordinances, and in accord the normal procedure applied to all other property owners and/or tenants applicants within the Town of Yorktown; and

6. For such other and further relief as this court may deem just and proper.

## COUNT FOUR

### DUE PROCESS CLAIMS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

(Procedural Due Process - 42 U.S.C. §1983)

1.    For compensatory damages against all defendants, jointly and severally, in the amount of Five Million dollars ($5,000,000.00) or in such an amount proven at trial;

2.    For punitive damages against all individually named defendants, jointly and severally; in the amount of Twenty Five Million dollars ($25,000,000.00) or in such an amount awarded at trial;

3.    For reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988(b);

4.    For any and all expert fees incurred by the plaintiff, pursuant to 42 U.S.C. §1988(c);

5.    For injunctive relief enjoining the defendants from interfering further with the plaintiffs efforts to secure any form of approvals or licenses associated with the plaintiffs intended use of their properties, from County, State or other governmental authorities, and an Order directing the defendants to process the plaintiffs' application(s) lawfully, properly, and in conjunction with existing Town rules and ordinances, and in accord the normal procedure applied to all other property owners and/or tenants applicants within the Town of Yorktown; and

6.    For such other and further relief as this court may deem just and proper.

79

## COUNT FIVE

### DUE PROCESS CLAIMS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

(Substantive Due Process - 42 U.S.C. §1983)

1.  For compensatory damages against all defendants, jointly and severally, in the amount of Five Million dollars ($5,000,000.00) or in such an amount proven at trial;

2.  For punitive damages against all individually named defendants, jointly and severally; in the amount of Twenty Five Million dollars ($25,000,000.00) or in such an amount awarded at trial;

3.  For reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988(b);

4.  For any and all expert fees incurred by the plaintiff, pursuant to 42 U.S.C. §1988(c);

5.  For injunctive relief enjoining the defendants from interfering further with the plaintiffs efforts to secure any form of approvals or licenses associated with the plaintiffs intended use of their properties, from County, State or other governmental authorities, and an Order directing the defendants to process the plaintiffs' application(s) lawfully, properly, and in conjunction with existing Town rules and ordinances, and in accord the normal procedure applied to all other property owners and/or tenants applicants within the Town of Yorktown; and

6.  For such other and further relief as this court may deem just and proper.

80

## COUNT SIX

### THE DEFENDANTS CONSPIRACY TO VIOLATE
### THE PLAINTIFFS' CIVIL RIGHTS

(Conspiracy Claim - 42 U.S.C. §1985)

1.  For compensatory damages against all defendants, jointly and severally, in the amount of Five Million dollars ($5,000,000.00) or in such an amount proven at trial;

2.  For punitive damages against all individually named defendants, jointly and severally; in the amount of Twenty Five Million dollars ($25,000,000.00) or in such an amount awarded at trial;

3.  For reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988(b);

4.  For any and all expert fees incurred by the plaintiff, pursuant to 42 U.S.C. §1988(c);

5.  For injunctive relief enjoining the defendants from interfering further with the plaintiffs efforts to secure any form of approvals or licenses associated with the plaintiffs intended use of their properties, from County, State or other governmental authorities, and an Order directing the defendants to process the plaintiffs' application(s) lawfully, properly, and in conjunction with existing Town rules and ordinances, and in accord the normal procedure applied to all other property owners and/or tenants applicants within the Town of Yorktown; and

6.  For such other and further relief as this court may deem just and proper.

Dated: June 10, 2008
     Mineola, New York

                     CAMPANELLI & ASSOCIATES, P.C.
                     Attorneys for Plaintiffs

By:                      _____
                     Andrew J. Campanelli, Esq. (AC 4014)
                     129 Front Street
                     Mineola, New York 11501
                     (516) 746-1600

# VERIFICATION

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NASSAU     )


THOMAS DeCHAIRO, being duly sworn, deposes and states that I am a Plaintiff in this

action and that the foregoing COMPLAINT is true to the best of my knowledge, except to those

matters therein stated to be alleged upon information and belief and as to those matters I believe

them to be true.

_____
THOMAS DeCHAIRO

Sworn to before me on this
___ day of June 2008

_____
NOTARY PUBLIC

ANDREW J. CAMPANELLI
Attorney At Law
NOTARY PUBLIC, State of New York
No. 02-5009014
Qualified in Nassau County
Commission Expires March 1, 20___

<u>AFFIDAVIT</u>

STATE OF NEW YORK          )
                                   : ss.:

COUNTY OF WESTCHESTER    )

        I, Michael Palmietto, residing at 49 Lakeview Ave. West, Cortland Manor NY 10567 being duly sworn, depose and say:

1. I am the former owner of the Old Stone Church on Rt. 6 at 1715 E. Main Street in Mohegan Lake, NY 10547.

2. I purchased the building sometime in the year 2000 with the intentions of converting this dormant building into a café'.

3. After I purchased the building, Mr. Nick Bianco, town board member encouraged me to change my plans for the building because Supervisor Linda Cooper wanted an upscale restaurant in the area.

4. Shortly after I met with Supervisor Cooper, Channel 12 News requested an interview and me. I called Mr. Bianco and told him that News 12 was going to be at the building in 30 minutes. He said he would be at the building for the interview with News 12.

5. Channel 12 interview Mr. Bianco in front of the main doors of the Old Stone Church. He said "This building has been dormant for 20 years and this town needs an upscale restaurant in the area". He also stated that he supported the project. This interview was video recorded by News 12 and it aired for over two weeks on Yorktown Channel 12 News. This video can be requested from News 12 at (914) 962-8343 Mr. Thomas Sciangula or Ms. Valerie Paul (914) 378-8916.

6. With the towns blessing, I started construction on the building.

7. For extra parking, the town was going to lease me adjacent property that the town owned. This was suggested by Mr. Bianco.

8. I followed the instructions of the building and planning departments and submitted over 20 different revisions of the site plans at a cost of over $35,000.

9. These revisions were requested and required by the various boards of the town. Including the environmental board, town board and the planning board. Each time I submitted plans, they requested that I make an alteration. This process was dragged out over 5 years and was a typical stall tactic of the town.

10. During this period of time, Mr. Nick Bianco requested that I make contributions to his political dinners for his reelection campaign. He insisted on CASH contributions and asked my not to attend the dinners so there would be no suspicion.

11. For over 3 years, while Mr. Bianco claimed to be a supporter of my project, I contributed over $3000 in cash contributions to his campaign, at his request.

12. In addition to money I gave to Mr. Bianco's campaign, Mr. Eric DiBartolo (Yorktown Highway Superintendent) requested I give money to him for Lou Campisi's fundraiser. He also requested this in cash. This money was used by Mr. DiBartolo to attend Mr. Campsis's fundraiser with all his staff. He told me that Campisi's vote was in the bag because Mr. DiBartolo got Mr. Campisi a Job with the Street Sweeping Company in Hawthorn NY. This conversation happened at Dante's Deli in Yorktown.

13. At Mr. DiBartolo request, I gave him an additional $7,000 over several months. One of these payments was made with a check. DiBartolo was using this money for political campaigns that he said would help me get my project approved.

14. My lawyer, Mr. Al Capalini was aware of the cash contributions, because I told him about them.

15. I also told Ms. Geri Schwalb about the cash contributions I was asked to make to Mr. Bianco's, DiBartolo and Mr. Campisi's political campaigns.

16. After approximately 5 years and many revisions to the plans with cost totaling over $50,000. The planning board, and environmental board approved the project. The only approval that remained was the vote by the town board.

17. During the meetings with the town board over the many months, Mr. Bianco stated that he wanted to buy the building for the town and he wanted me to think of a price. This happened on more then one occasion and it was reported in the newspapers.

18. In addition to Mr. Bianco asking to buy the building at the town board meetings, I met with Mr. Bianco and Charlie DeGockimo _____ (not sure of spelling) at the Mt. Kisco Diner. Mr. Bianco restated that he wanted to buy the building and again asked me to think of a price. He also told me to stop giving money to Eric DeBartola because he knew I was paying him and he was jealous.

19. Because I wouldn't consider selling the town the old stone church building, Mr. Bianco used his influence over Mr. Campisi to get him to vote against my proposal. He did this by getting Mr. Campisi the conservative line on the ballot.

20. On ___ Date, the town board rejected my restaurant proposal namely because of traffic and parking. See meeting minutes.

21. These reasons are not valid as the town commissioned a traffic study which stated that "No Significant Traffic would be added to route 6 with this restaurant" – See newspaper articles with quotes from Linda Cooper, etc.

22. After the town rejected my proposal, the Yorktown Landmark commission tried to landmark the building even though I was opposed to this.

23. In 2004, the Yorktown town board changed the Landmarking law so that owner consent was not needed. This was done, in my opinion, just to hamper the progress of my project.

24. Once the project seemed dead, I requested permits to add town sewer service to the building and the town held up these permits with many many delays.

25. After getting nowhere with the town and spending several hundred thousand dollars, I listed the building for sale.

26. I received an offer for $750,000 from someone, but because I couldn't get a sewer permit, I lost the sale. (Talk Geri Schwalb – Real Estate Agent)

27. I believe the town was purposely holding me up on the permits and my project in general in order to get the price of the building down. Then they would come in and buy it at a low price.

28. Early in 2005 I was offered $400,000 by a shady pastor of an unknown church. His name was Pastor Bondi from Putnam Valley. Mr. Bondi was working with Mr. Bianco and Supervisor Cooper and was being directed by Mr. Bianco.

29. Once Mr. Bondi approached the town, they endorsed his purchase (in an official town board resolution) and then the sewer permits were issued without delay. The town was under the impression that Mr. Bondi had a signed contract for the sale of the building and therefore issued the permits without delay.

30. I then sold the building to Mr. Thomas DeChiaro and the town was not happy with this.


Michael Palmietto


Sworn to before me this 2 day of May 2008


Notary Public

MARIA A. SALEMMO
Notary Public, State of New York
Qualified in Westchester County
Reg. No. 4970485
My Comm. Expires August 13, 2010



**STATE OF NEW YORK**
**DEPARTMENT OF AGRICULTURE AND MARKETS**
**10B Airline Drive**
**Albany, New York  12235**

*Division of Agricultural Protection*
*and Development Services*
*518-457-7076*
*Fax. 518-457-2716*

October 18, 2005

Tom DeChairo
10 Gilead Road
Mahopac, NY  10541

Dear Mr. DeChairo:

I have attached a portion of the definitions section of the Agriculture and Markets Law (AML) that defines "farm operation" plus two other definitions that are embedded within.  These definitions are used in the administration and enforcement of the AML.

The definition of "farm operation" includes land and buildings that are used to produce, prepare and market crops, livestock and livestock products.  Grapes are considered a crop and the processing of grapes into wine and the marketing of the same are considered part of a farm operation.

If you need anything further, please let me know.

Sincerely,

Robert Somers, Ph.D.
Chief, Agricultural Protection Unit

Enclosure



Andrew J. Spano, Westchester County Executive
County Board of Legislators



Agriculture & Farmland
Protection Board
of Westchester County

## Report of the
## Westchester County Agriculture and Farmland Protection Board
## for the Addition of New Parcels to
## Westchester County Agricultural District No. 1
## Calendar Year 2007

**Background:**

Westchester County encourages the preservation of agricultural land and the promotion of the agricultural industry within the county in recognition of the important role it plays in protecting open space and the environment; preserving community, cultural, and scenic character; providing locally grown agricultural products; offering unique agricultural services and educational opportunities; and supporting the economy. The County has implemented a number of programs and initiatives to protect its remaining farmland and encourage a strong agricultural industry, including the creation of the County Agriculture and Farmland Protection Board and the Westchester County Agricultural District. Agricultural districts provide benefits that help make and keep farming as a viable economic activity, thereby maintaining land in active agricultural use. Agricultural districts encourage development pressure to focus on other areas of a community and provide farm owners protection under the state's Right to Farm laws.

Agricultural Districts must be recertified periodically (the review period for Westchester's Agricultural District is every eight years). In 2003 New York State Agriculture and Markets Law (AML) was amended to allow property owners to petition to include their lands within an existing agricultural district. Prior to the 2003 amendment, property owners would have to wait for the end of the review period. Lands to be included in the district must be determined to be predominantly viable agricultural land per AML §301.7 and also serve the public interest by assisting in maintaining a viable agricultural industry within the district. Applications are made to the Westchester County Board of Legislators, which refers the requests to the Westchester County Agriculture and Farmland Protection Board (AFPB) for review and recommendation back to the Board of Legislators. Final recommendations are sent to the State Commissioner of Agriculture for review and certification. The application period ends January 31 of each year. This report represents the results of the review of the AFPB for applications received for 2007.

**Date of Report:**

The Westchester County Agriculture and Farmland Protection Board made the following recommendations by majority vote at its March 29th, 2007 meeting.

**2007 Recommendations:**

The Westchester County Agriculture and Farmland Protection Board received ten applications for the inclusion of additional land within Westchester County Agricultural District Number 1. Of those, the AFPB recommends the inclusion of the following eight applications.

2007-02, Mustang Sally Farm, Bedford
2007-03, Todd Farm, Lewisboro
2007-05, Hidden Hollow Farm, Yorktown
2007-06, Sunhill Farms, Somers

2007-07, The Winery at St. George, Yorktown
2007-08, Rainbeau Ridge Farm, Bedford
2007-09, Tanrackin Farm, Bedford
2007-10, Meadows Farm Stand, Yorktown

The Westchester County Agriculture and Farmland Protection Board did not recommend including applications 2007-01 or 2007-04 for the reasons specified in the following section.

000370

2007 Report of the Westchester County Agriculture and Farmland Protection Board
for the Inclusion of Additional Land in the Westchester County Agricultural District

# DETAILED REVIEW

Application Number: 2007-07

Farm Name: The Winery at St. George

Parcel Acreage: 0.7±

Tax Parcel Identification (Section-Block-Lot): 15.12-2-53

Property Address: 1715 East Main Street, Yorktown

AFPB Site Visit Date: February 22, 2007

Property Location: The farm is located on the east side of East Main Street, at the southeast corner of the
    intersection of East Main Street and Route 6 in the Town of Yorktown.

Description of Property:
    The site is a small parcel of land with an existing church building and small parking area. The site
    is flat, with a DEC regulated wetland located on the southern portion of the parcel and to the east
    of the parcel. The parcel is located with frontage on and access to East Main Street. The applicant
    stated to the AFPB that he will minimize any potential impacts to the nearby wetlands and will
    pursue all required local permits for the winery. The AFPB has consulted with staff from the
    NYS Department of Agriculture and Markets, who stated that the production and marketing of
    wine could be considered part of the vineyard operation being conducted on a separate parcel of
    land.

Does the parcel consist predominantly of viable agricultural land? ■ Yes ☐ No  The subject parcel is
    being considered part of a larger viticulture operation. The AFPB has determined that the
    applicant has submitted an adequate plan for the proposed viticulture operation and has
    demonstrated a significant commitment to implement that plan.

Description of Agricultural Operation:
    The applicant has submitted a proposal and plan for the operation, which was reviewed by the
    AFPB and found to be thorough with adequate detail to describe the agricultural nature of the
    operation. The winery will be used to process grapes from a number of parcels of land in the area,
    which the applicant plans to lease from existing farms. The applicant submitted a proposal to
    Westchester County to license approximately four acres of land at the County-owned Hilltop
    Hanover Farm (which is already in the agricultural district). Lucille Munz, the Farm Manager at
    Hilltop Hanover Farm and David Kvinge from the County Department of Planning have
    confirmed this and indicated the license agreement had not been finalized at the time of the AFPB
    review. The applicant also submitted information describing his intent to plant approximately
    3,000 grape vines at Hilltop Hanover Farm in the spring of 2007. In accordance with New York
    State Department of Agriculture and Markets, the processing of grapes into wine and the
    marketing of same is considered part of a farm operation, whether located on the same parcel as
    the vineyard or not. The entire operation is considered a startup farm operation.

Will proposed operation serve the public interest by assisting in maintaining a viable agricultural industry
    within the district? ■ Yes ☐ No  The site is well suited to the winery operation, and the winery
    operation, as a component of the larger viticulture operation, will serve the public interest by
    assisting in supporting and maintaining a viable agricultural industry within the county.

Agriculture and Farmland Protection Board Recommendation:

    ☐ Include the parcel.

    ☐ Do not include the parcel at this time for the following reasons:

**000377**

2007 Report of the Westchester County Agriculture and Farmland Protection Board
for the Inclusion of Additional Land in the Westchester County Agricultural District

## DETAILED REVIEW

☐ Include only the following tax parcel(s) on which the agricultural operation is located:

■ Include the parcel, subject to the understanding that only the winery operation described herein
will be protected under the right to farm laws. The winery operation must be used to
produce and sell wine predominantly from grapes grown as part of the agricultural
operation. In addition, the applicant must demonstrate a good faith effort to secure all
local permits and approvals.





Andrew J. Spano
County Executive

July 6, 2007

Westchester County Board of Legislators
800 Michaelian Office Building
148 Martine Avenue
White Plains, New York 10601

Dear Members of the County Board of Legislators:

Transmitted herewith for your consideration is legislation which, if adopted by an
affirmative vote of a majority of the voting strength of your Honorable Board, would
recommend the inclusion of a number of additional parcels of land within the
Westchester County Agricultural District.

Agricultural land and the agricultural industry in Westchester County continues to be
under considerable pressure to convert to other land uses, typically residential
subdivision. Agricultural land contributes significantly to the quality of life in
Westchester County by providing open space, links to our cultural history, vegetative and
wildlife habitat, and a local source of fresh food. The protection and enhancement of
agricultural land is in furtherance of the County's goals, as described in the County
Planning Board's long range planning document, Patterns for Westchester: the Land and
the People, to protect natural and cultural resources, preserve open space and community
character, and reduce environmental impacts associated with development.

As you are aware, this Honorable Board, by Resolution No. 223-2000 submitted a
proposal to the New York State Commissioner of Agriculture and Markets to establish
Westchester County Agricultural District No. 1. The New York State Commissioner of
Agriculture and Markets certified the land designated in Resolution No. 223-2000 for
districting on April 20, 2001. Pursuant to the terms of Section 303 of the New York State
Agriculture and Markets Law ("Agriculture and Markets Law"), the New York State
Commissioner of Agriculture and Markets' certification of Westchester County
Agricultural District No. 1 became effective on July 19, 2001. Pursuant to the terms of
Section 303 of the Agriculture and Markets Law and Resolution No. 223-2000, this
Honorable Board is required to complete a review of the lands composing Westchester
County Agricultural District No. 1 on or before July 19, 2009. There are currently no
certified Agricultural Districts within the County of Westchester other than Agricultural
District No. 1.

by Section 303-b of the Agriculture and Markets Law and Westchester County Act No. 55-2004.

Sincerely,

Andrew J. Spano
County Executive


AJS/CMI/nn
Attachment

000416

TO:    BOARD OF LEGISLATORS
          COUNTY OF WESTCHESTER

Your Committee is in receipt of a report from the Westchester County

Agricultural and Farmland Protection Board stating its recommendations concerning ten

pending requests for the inclusion of viable agricultural land within Westchester County

Agricultural District No. 1 as well as a communication from the County Executive

concerning those recommendations.


Your Committee has carefully reviewed the above-referenced report and is aware

that this Honorable Board is charged with the duty, pursuant to Section 303-b of the New

York State Agriculture and Markets Law and Westchester County Act No. 55-2004, of

scheduling a Public Hearing concerning requests to add parcels to an existing

Westchester County Agricultural District and the recommendations of the Westchester

County Agricultural and Farmland Protection Board concerning those requests.


Your Committee recommends that this Honorable Board carry out the foregoing

statutory duty by adopting a Resolution scheduling a Public Hearing upon the proposed

additions to Westchester County Agricultural District No. 1 as soon as possible.


Your Committee is advised that there are two applications this year that are

significantly different than applications for the more traditional agricultural operations in

that they are for activities ancillary to an agricultural activity located on separate, non-

contiguous parcels of land from the actual agricultural activity. The first is for a winery

operation, located on a 0.7-acre parcel of land in the Town of Yorktown, which will be used to process grapes grown on a portion of Hilltop Hanover Farm, a County-owned farm in Yorktown. The applicant has a license agreement with the County for the vineyard and has planted approximately 3,000 grape vines. The second application is a farm stand, located on a 0.4-acre parcel of land in Yorktown Heights, which sells produce grown on non-contiguous properties operated by the owner of the farm stand.

Your Committee is further advised that one of the primary issues concerning such ancillary uses is that they predominantly (greater than 51%) use or sell agricultural products produced as part of the actual agricultural operation to which the ancillary use is related. The applicant for the winery has stated that the winery will utilize a predominance of grapes grown at Hilltop Hanover Farm, or other future viticulture operations in which he may obtain a valid ownership interest or license since the grape vines at Hilltop Hanover will not produce grapes for approximately three years from the date of planting in the Spring of 2007.The County has been informed by New York State Department of Agriculture and Markets that this is typical and that their policy is to allow 3-5 years for the vineyard to produce an adequate crop of grapes for the winery operation. The applicant for the farm stand has stated on the record that approximately 80% of the products sold at the farm stand are produced from the applicant's farm operation. Specific language has been added to the resolution to address this issue and to ensure that both these ancillary uses will only be considered ancillary to agricultural operations if the applicants provide written documentation to the County Agriculture and Farmland Board and the County Board of Legislators that the ancillary uses utilize a predominance of

products produced on the applicant's farm (grapes for the winery and crops or other agricultural products for the farm stand).

Your Committee would advise, based upon its careful review of the report of the Westchester County Agricultural and Farmland Protection Board and barring the emergence of any adverse information during the course of the scheduled Public Hearing, that this Honorable Board, by Resolution, approve the inclusion in Westchester County Agricultural District No. 1 of so many of the pending requests as are consistent with the recommendation of the Westchester County Agricultural and Farmland Protection Board.

Additionally, and as you know, your Honorable Board must comply with the requirements of the State Environmental Quality Review Act ("SEQRA"). The Department of Planning has advised that this proposed Resolution is classified as an Unlisted Action under SEQRA regulations that requires the adoption of the attached Negative Declaration. Your Committee concurs in this conclusion.

As this project is an "Unlisted" action under the State Environmental Quality Review Act ("SEQRA"), your Committee is also in receipt of an Environmental Assessment Form prepared by the Department of Planning to assist this Honorable Board in making a determination as required by SEQRA, which is necessary if this Honorable Board is to approve the attached Resolution.

Your Committee has carefully considered the proposed legislation. It has reviewed the attached Environmental Assessment Form and the criteria contained in

Section 617.7 of 6 NYCRR Part 617, the SEQRA regulations, to identify the relevant areas of environmental concern.

Your Committee has thoroughly analyzed the identified relevant areas of concern to determine if the proposed action may have a significant impact on the environment. For reasons set forth in the attached proposed Negative Declaration, your Committee believes that the proposed action will not have any significant impact on the environment and accordingly recommends passage of the annexed Resolution.

Your Committee has carefully considered the proposed legislation and recommends that your Honorable Board adopt a Resolution scheduling a public hearing concerning pending requests to add additional parcels to Westchester County Agricultural District No. 1 as well as a further Resolution, barring the emergence of any adverse information during the course of the scheduled Public Hearing, approving the inclusion in Westchester County Agricultural District No. 1 of so many of the pending requests as are consistent with the recommendation of the Westchester County Agricultural and Farmland Protection Board.

Your Committee requests that the Department of Planning notify each community



in which the additional parcels are located of the date and time of the Public Hearing.


Dated:                    2007
        White Plains, New York


COMMITTEE ON

<u>RESOLUTION NO.        - 2007</u>

RESOLVED, THAT THIS Board hold a public hearing pursuant to Section 303-b of the New York State Agriculture and Markets Law and Westchester County Act No. 55-2004 upon the proposed inclusion of additional parcels of land within Westchester County Agricultural District No. 1. The public hearing will be held at 7:30 p.m. on the ____ day of _____, 2007 in the Chambers of the Board of Legislators, 8th Floor, Michaelian Office Building, White Plains, New York. The Clerk of the Board shall cause notice of this hearing, in the form annexed hereto, to be published at least once in one or more newspapers published in the County of Westchester and selected by the Clerk of the Board for that purpose and shall further provide written notice, in the form annexed hereto, to each municipality with territory that would be encompassed within the proposed district and to the New York State Commissioner of Agriculture and Markets.

## NOTICE

NOTICE IS HEREBY GIVEN that, pursuant to Section 303-b of the New York

State Agriculture and Markets Law and Westchester County Act No. 55-2004, the

Westchester County Board of Legislators has received requests for the inclusion of

additional parcels of predominantly viable agricultural land within Westchester County

Agricultural District No. 1.

Those additional parcels are described as follows:

| Request No. | Property Street Address | Jurisdiction | Acreage |
|---|---|---|---|
| 2007-01 | 20 Old Post Road | Bedford | 25.4 |
| 2007-02 | 97 West Patent Road | Bedford | 8.6 |
| 2007-03 | Todd Road | Lewisboro | 102.9 |
| 2007-04 | 567 Grant Street | North Salem | 7.5 |
| 2007-05 | 427 Birdsall Drive | Yorktown | 8.9 |
| 2007-06 | 20 Sunhill Road | Somers | 4.0 |
| 2007-07 | 1715 East Main Street | Yorktown | 0.7 |
| 2007-08 | 403 Harris Road | Bedford | 10.1 |
| 2007-09 | 270 Guard Hill Road | Bedford | 4.1 |
| 2007-10 | Underhill Avenue | Yorktown | 0.4 |

The Westchester County Board of Legislators, pursuant to Section 303-b of the

New York State Agriculture and Markets Law and Westchester County Act No. 55-2004,

shall hold a public hearing to consider the proposed inclusion of these additional parcels

of land in Westchester County Agricultural District No. 1 and the recommendations of

the Westchester County Agricultural and Farmland Protection Board.  The public hearing

will be held at 7:30 p.m. on the _____ day of _____, 2007 in the Chambers of the Board

of Legislators, 8th Floor, Michaelian Office Building, White Plains, New York.

000,051

## SHORT ENVIRONMENTAL ASSESSMENT FORM

### PART 1 - PROJECT INFORMATION

1. **APPLICANT/SPONSOR**

   County of Westchester

2. **PROJECT NAME**

   Additions to Westchester County Agricultural District

3. **PROJECT LOCATION:**

   Towns of Bedford, Lewisboro, Somers, and Yorktown

   County: Westchester

4. **PRECISE LOCATION:**

   See attached.

5. **IS PROPOSED ACTION:**

   _____ New          \_X\_ Expansion          _____ Modification/alteration

6. **DESCRIBE PROJECT BRIEFLY:**

   The proposed action is to recommend inclusion of a number of parcels of land into the existing Westchester County Agricultural District, in accordance with Article 25 of New York State Agriculture and Markets Law.

7. **AMOUNT OF LAND AFFECTED:**

   Initially  ±140_____  acres          Ultimately  ±140_____  acres

   Refer to attached information sheet for acreage by application.

8. **WILL PROPOSED ACTION COMPLY WITH EXISTING ZONING OR OTHER EXISTING LAND USE RESTRICTIONS?**

   _____ Yes          _____ No    If no, describe briefly

   NA - Municipalities in which Agricultural Districts are located are required to incorporate agriculture in their local planning efforts and are prohibited from unreasonably restricting agricultural operations through local zoning. The Westchester County Agricultural District is already located in each of the communities for the subject applications.



Inclusion of Additional Parcels within the Westchester County Agricultural District
Short EAF
Page 2

9.    **WHAT IS PRESENT LAND USE IN VICINITY OF PROJECT?**

   __X__ Residential    _____ Industrial    _____ Commercial    __X__ Agricultural

   _____ Park/Forest/Open Space    _____ Other    See below.

**DESCRIBE:**

Parcels proposed to be included in the Agricultural District must consist primarily of viable
agricultural land. Applications are also reviewed to ensure that they include agricultural
operations (either existing or proposed) that will support the agricultural industry in Westchester
County.

10.    **DOES ACTION INVOLVE A PERMIT APPROVAL, OR FUNDING, NOW OR
ULTIMATELY FROM ANY OTHER GOVERNMENTAL AGENCY (FEDERAL, STATE
OR LOCAL)?**

   __X__ Yes    _____ No    If yes, list agency(s) and permit/approvals

Following approval by the County Board of Legislators, the applications will be submitted to the
New York State Department of Agriculture and Markets for review and certification.

11.    **DOES ANY ASPECT OF THE ACTION HAVE A CURRENTLY VALID PERMIT OR
APPROVAL?**

   _____ Yes    _____ No    If yes, list agency(s) and permit/approvals

N/A – The Westchester County Agricultural District was created in 2001.

12.    **AS A RESULT OF PROPOSED ACTION, WILL EXISTING PERMIT/APPROVAL
REQUIRE MODIFICATION?**

   _____ Yes    _____ No

N/A – The Westchester County Agricultural District will be modified to include any parcels
approved by the New York State Department of Agriculture and Markets.

**I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE TO THE BEST OF MY
KNOWLEDGE.**

Applicant/Sponsor Name: _____County of Westchester_____ Date: __May 21, 2007__

Signature: _____

David S. Kvinge, Director of Environmental Planning

000**423**

Inclusion of Additional Parcels within the Westchester County Agricultural District
Short EAF
Page 3

## PART II - ENVIRONMENTAL ASSESSMENT

A. **DOES THE ACTION EXCEED ANY TYPE I THRESHOLD IN 6 NYCRR, PART 617.4?** If yes, coordinate the review process and use the Full EAF.

_____ Yes        \_\_X\_ No

B. **WILL ACTION RECEIVE COORDINATED REVIEW AS PROVIDED FOR UNLISTED ACTIONS IN 6 NYCRR, PART 617.6?** If no, a negative declaration may be superseded by another involved agency.

_____ Yes        \_\_X\_ No

C. **COULD ACTION RESULT IN ANY ADVERSE EFFECTS ASSOCIATED WITH THE FOLLOWING:**

**C1.** **Existing air quality, surface or groundwater quality or quantity, noise levels, existing traffic patterns, solid waste production or disposal, potential for erosion, drainage or flooding problems? Explain briefly:**

Inclusion in the Agricultural District promotes the preservation of agricultural land uses and, combined with other efforts to reduce environmental impacts associated with agricultural operations, is intended to reduce significant environmental impacts.

**C2.** **Aesthetic, agricultural, archaeological, historic, or other natural or cultural resources; or community or neighborhood character? Explain briefly:**

No Adverse Impact. See C1.

**C3.** **Vegetation or fauna, fish, shellfish or wildlife species, significant habitats, or threatened or endangered species? Explain briefly:**

No Adverse Impact. The protection of existing agricultural lands and the natural resources on them will protect any associated wildlife habitat.

**C4.** **A community's existing plans or goals as officially adopted, or a change in use or intensity of use of land or other natural resources? Explain briefly:**

No Adverse Impact. The preservation of agricultural land is consistent with the policies identified in the County Planning Board's long-range planning document, *Patterns for Westchester: the Land and the People*. The preservation of open space, natural resources, and community character are stated goals of most local municipal plans.

Inclusion of Additional Parcels within the Westchester County Agricultural District
Short EAF
Page 4

C5. **Growth, subsequent development, or related activities likely to be induced by the proposed action?  Explain briefly:**

Protection of farmland will reduce the potential for the land to be developed with land uses that carry higher demands on services or result in more adverse impacts to the local municipality.

C6. **Long-term, short-term, cumulative, or other effects not identified in C1-C5?  Explain briefly:**

None.

C7. **Other impacts (including changes in use of either quantity or type of energy)?  Explain briefly:**

None.

D. **WILL THE PROJECT HAVE AN IMPACT ON THE ENVIRONMENTAL CHARACTERISTICS THAT CAUSED THE ESTABLISHMENT OF A CEA?**

_____ Yes        \_\_\_X\_\_ No      If yes, explain briefly:

E. **IS THERE, OR IS THERE LIKELY TO BE, CONTROVERSY RELATED TO POTENTIAL ADVERSE ENVIRONMENTAL IMPACTS?**

\_\_X\_\_ Yes        _____ No      If yes, explain briefly:

There has been some confusion concerning the level of protection given to landowners within agricultural districts and the impacts to communities in which parcels are located.  The Agricultural District is one component of the County's agricultural protection program, which also includes education and outreach to municipalities concerning the importance and preservation of agriculture and the promotion of best management practices to reduce impacts from agricultural operations. Outreach has been performed and will be resent to affected municipalities again prior to the public hearing. Municipalities, property owners, and others will be given the opportunity to comment on the applications at the public hearing.

Inclusion of Additional Parcels within the Westchester County Agricultural District
Short EAF
Page 5

## PART III - DETERMINATION OF SIGNIFICANCE

___    Check this box if you have identified one or more potentially large or significant adverse impacts which MAY occur. Then proceed directly to the FULL EAF and/or prepare a positive declaration.

X    Check this box if you have determined, based on the information and analysis above and any supporting documentation, that the proposed action WILL NOT result in any significant adverse environmental impacts AND provide on attachments, as necessary, the reasons supporting this determination:

_____ Westchester County Board of Legislators _____
Name of Lead Agency

| | |
|---|---|
| _____Tina Seckerson_____ | _____Clerk of the Board of Legislators_____ |
| Name of Responsible Officer | Title |
| | _____ |
| _____ | |
| Signature of Responsible Officer | Signature of Preparer |
| | David S. Kvinge, AICP, ASLA |
| | Director of Environmental Planning |

_____
Date

ASA000

STATE ENVIRONMENTAL QUALITY REVIEW

**NEGATIVE DECLARATION**

This notice has been prepared pursuant to Part 617 of the implementing regulations pertaining to Article 8 of the New York State Environmental Conservation Law.

The Westchester County Board of Legislators has assumed the role of Lead Agency for the action described below. It has been determined by the County Board of Legislators that the proposed action will not have a significant effect on the environment.

TITLE OF
ACTION:               Inclusion of Additional Parcels within the
                      Westchester County Agricultural District


LEAD AGENCY:          Westchester County Board of Legislators


SEQR STATUS:          Unlisted Action


LOCATION
OF ACTION:            Towns of Bedford, Lewisboro, Somers, and Yorktown within Westchester
                      County, New York


NATURE
OF ACTION:            Inclusion of Additional Parcels within the Westchester County Agricultural
                      District, as provided for under Section 303-b of Article 25-AA of New York
                      State Agriculture and Markets Law. More specifically applications 2007-02,
                      2007-03, 2007-05, 2007-06, 2007-07, 2007-08, 2007-09, and 2007-10 as
                      described on the 2007 Agriculture and Farmland Protection Board Report.


SEQR DETERMINATION:   Negative Declaration

Inclusion of Additional Parcels within the Westchester County Agricultural District
Negative Declaration
Page 2

## BACKGROUND:

SEQR Classification – The proposed action is classified as an Unlisted action pursuant to Section
617.2 (ak), "...all actions not identified as a Type I or Type II action...."

Lead Agency – The proposed action is in accordance with Article 25 of the New York State
Agriculture and Markets Law. As such the proposed additions to the Agricultural District
are subject to the approval of the Westchester County Board of Legislators and
certification by the NYS Department of Agriculture and Markets. The County Board of
Legislators is conducting uncoordinated review as permitted for Unlisted actions.

Project Purpose/Need – Agricultural land and the agricultural industry in Westchester County
continues to be under considerable pressure to convert to other land uses, typically
residential subdivision. Agricultural land contributes significantly to the quality of life in
Westchester County by providing open space, links to our cultural history, vegetative and
wildlife habitat, and a local source of fresh food. The protection and enhancement of
agricultural land is in furtherance of the County's goals, as described in the County
Planning Board's long-range planning document, *Patterns for Westchester: the Land and
the People*, to protect natural and cultural resources, preserve open space and community
character, and reduce the environmental impacts associated with development. The
Westchester County Board of Legislators created the Westchester County Agricultural
District and the Agriculture and Farmland Protection Board to protect and enhance
agricultural land. New York State Agriculture and Markets Law requires that Counties
that have a certified agricultural district receive and review applications annually for the
inclusion of additional parcels of land within the Agricultural District.

## REASONS SUPPORTING THIS DETERMINATION:

Inclusion of additional agricultural parcels within the Agricultural District, combined with
concurrent efforts to reduce potential environmental impacts associated with agricultural
operations, will further the goals and objectives of the County to:
- Preserve and protect the county's natural resources, including the drinking water
  supply;
- Assure a diverse and interconnected system of open space, providing contrast in the
  texture of the landscape;
- Enhance a broad economic base and economic opportunity within the county; and
- Protect the county's educational, cultural, and historic resources for future
  generations.

ESP000

Inclusion of Additional Parcels within the Westchester County Agricultural District
Negative Declaration
Page 3

DETERMINATION:  Based on the information in the attached Environmental Assessment Form
and the criteria in Section 617.7 of 6 NYCRR Part 617, the Westchester County Board of
Legislators has determined that the proposed project will not have a significant impact on
the environment.

CONTACT
PERSON:              David Kvinge, Director of Environmental Planning
                     432 Michaelian Office Building
                     148 Martine Avenue
                     White Plains, NY 10601
                     (914) 995-4400

_____                    _____
Tina Seckerson, Clerk                        Date
Westchester County Board of Legislators

Enclosures:
        Short Environmental Assessment Form

cc:

County:

        Office of the County Executive
        Att:  Lawrence Schwartz, Deputy County Executive

        Charlene M. Indelicato, County Attorney

        Gerard E. Mulligan, Commissioner, Dept. of Planning

Other:
        Town of Bedford              Town of Lewisboro
        Town of Somers               Town of Yorktown

        New York State Department of Agriculture and Markets
           10B Airline Drive, Albany, New York 12235

## RESOLUTION NO.    – 2007

WHEREAS, the County, by Resolution No. 223-2000, submitted a proposal to the New York State Commissioner of Agriculture and Markets to establish Westchester County Agricultural District No. 1, which was certified by the New York State Commissioner of Agriculture and Markets and became effective on July 19, 2001; and

WHEREAS, the County, by Act No. 55-2004 in accordance with Section 303-b of New York State Agriculture and Markets Law, established an annual 30-day period in which to receive applications for the inclusion of additional parcels of land within Westchester County Agricultural District No. 1; and

WHEREAS, Westchester County Agricultural District No. 1 is the only certified agricultural district within Westchester County; and

WHEREAS, the Westchester County Board of Legislators has received ten applications for inclusion of parcels of land into Westchester County Agricultural District No. 1, one of which is for a parcel already in the Agricultural District; and

WHEREAS, the applications were forwarded to the Westchester County Agriculture and Farmland Protection Board for review and report, and the Board, after due deliberation and consideration of the conditions of each parcel and the agricultural operations on them or planned for them, determined whether the parcels consisted

000364

primarily of viable agricultural land as defined by New York State Agriculture and Markets Law and whether the existing or proposed agricultural operation serves the public interest by assisting in maintaining a viable agricultural industry, and recommended approval of eight of the applications; and

WHEREAS, agricultural land contributes significantly to the quality of life in Westchester County by providing open space, links to our cultural history, vegetative and wildlife habitat, and a local source of fresh food; and

WHEREAS, the protection and enhancement of agricultural land is in furtherance of the County's goals to protect natural and cultural resources, preserve open space and community character, and reduce the environmental impacts associated with development; and

WHEREAS, a duly noticed public hearing was held on _____, at which time local municipalities, the public, and other interested parties where given the opportunity to comment on the proposed addition of parcels to the Agricultural District; and

WHEREAS, applications 2007-07 and 2007-10 are for ancillary operations related to agricultural operations located on separate, non-contiguous parcels of land and are thus contingent upon the relationship between the ancillary use and the actual farm

000365

operation as they must utilize a predominance of agricultural products produced on the actual farm operation.

NOW, THEREFORE, BE IT RESOLVED, that the Westchester County Board of Legislators approves the unconditional inclusion of the following applications for additional parcels of land within the Westchester County Agricultural District: Application #2007-02, #2007-03, #2007-05, #2006-06, #2007-08 and #2007-09, which applications are more fully described in the report of the Agriculture and Farmland Protection Board; and

BE IT FURTHER RESOLVED, that the ancillary operation (a winery) described in Application 2007-07 be included in the Agricultural District, subject to the following:

a) The Applicant shall submit no later than January 15 of each year, to the Agriculture and Farmland Protection Board, with a copy to the County Board of Legislators and County Departments of Planning, Law and Public Works, a written document describing the origin of the grapes used in the winery operation in the preceding year and estimated for the reporting year. The document shall list the origin of the grapes and include the percentage of grapes used by each vineyard where they were grown.

b) The Applicant shall submit to the Agriculture and Farmland Protection Board, with a copy to the County Board of Legislators and County Departments of Planning, Law and Public Works, written documentation substantiating ownership or an interest in the land on which the agricultural

000366

activity, to which the ancillary use is related, is located. The Applicant shall

notify the Board of Legislators and the Agriculture and Farmland Protection

Board of any change in the status of such ownership or interest, within thirty

(30) days of any change in such. The County will forward such notice or a

failure to comply with these requirements to the New York State Department

of Agriculture and Markets and will seek to exclude the ancillary use from the

Agricultural District or from receiving any benefits under the Right to Farm

laws; and

BE IT FURTHER RESOLVED, that the ancillary operation (a farm stand) is

described in Application 2007-10 be included in the Agricultural District, subject to the

following:

a)    The Applicant shall submit no later than January 15 of each year to the

Agriculture and Farmland Protection Board, with a copy to the County Board

of Legislators and County Departments of Planning and Law, a written

document describing the origin of the products sold at the farm stand in the

preceding year and estimated for the reporting year. The document shall list

the origin of the products sold and include the percentage of each by where

they were grown.

b)    The Applicant shall submit to the County Agriculture and Farmland Board,

with a copy to the County Board of Legislators and County Departments of

Planning and Law, written documentation substantiating ownership or an

interest in the land on which the agricultural activity, to which the ancillary

000367

use is related, is located. The Applicant shall notify the Board of Legislators and the Agriculture and Farmland Protection Board of any change in the status of such ownership or interest, within thirty (30) days of any change in such. The County will forward such notice or a failure to comply with these requirements to the New York State Department of Agriculture and Markets and will seek to exclude the ancillary use from the Agricultural District or from receiving any benefits under the Right to Farm laws; and

BE IT FURTHER RESOLVED, that the Planning Department is directed to forward a copy of this Resolution, along with the report of the Agriculture and Farmland Protection Board and other required information in support of the applications to the Commissioner of the New York State Department of Agriculture and Markets for review and certification.

Dated:                    2007
        White Plains, New York

000368



# WESTCHESTER COUNTY BOARD OF LEGISLATORS

800 MICHAELIAN OFFICE BUILDING
148 MARTINE AVENUE
WHITE PLAINS, NEW YORK 10601
(914) 995-2828
FAX: (914) 995-3884
goo6@westchestergov.com

**GEORGE OROS**
**Minority Leader**
*Legislator, 1st District*
5 Justin Court
Cortlandt Manor, New York 10567

**Member**
Committee on Legislation
Committee on Budget & Appropriations
Committee on Appointment
Committee on General, Cultural
and Ethnic Diversity

September 10, 2007

Dear Mohegan Lake Resident,

Recently the owner of the St. George Chapel (the old stone church at 1715 East Main Street) petitioned the County to have this three quarter acre site designated as part of an Agriculture District. First, let me assure you I will do all I can to defeat this measure.

If the County were to grant this parcel an Agriculture District designation, it would remove much of the existing zoning restrictions and requirements as well as environmental regulations. Without reasonable controls in place, this designation could lead to increased development of the parcel. Such development would adversely impact the surrounding wetlands potentially leading to more flooding. Any development of this parcel for the purpose envisioned by this plan would lead to increased traffic and congestion.

For too long the Mohegan Lake area has been subject to over development and unwanted traffic. You may recall the struggle many of us were in to prevent the Wallhauer paint store from being constructed on Route 6. This latest attempt to designate this parcel as an agriculture district is another example of using clever loopholes to circumvent zoning and further burden the Mohegan Lake/Route 6 corridor. Enough is enough.

As your County Legislator, I pledge to do all in my power to prevent this designation. Please let me know what you think. Together we can prevent this measure from being enacted.

Sincerely,

George Oros
*Westchester County Legislator*
*District 1*

## Crane, Christopher

**From:** Juan Stephan [juanstephan@hotmail.com]

**ent:** Tuesday, October 16, 2007 4:22 PM

**To:** Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally; Crane, Christopher; Bochow, Brian; Jenkins, Ken; lesiegel@optonline.net; Maisano, James

**Subject:** The Yorktown Winery

I was very upset to hear that some are trying to block the opening of this project. I have personally visited this site and this classy business not only does justice to the old church but it will vitalize our cumminity!

Please support this project

Juan Cesar Cardina-Hernandez

---

Boo! Scare away worms, viruses and so much more! Try Windows Live OneCare! Try now!

000497

## Crane, Christopher

| | |
|---|---|
| **From:** | arth@optonline.net |
| **_nt:** | Tuesday, October 16, 2007 9:25 PM |
| **To:** | Maisano, James; lesiegel@optonline.net; Jenkins, Ken; Bochow, Brian; Crane, Christopher; Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally |
| **Cc:** | tomde@TheWineryAtStGeorge.com |
| **Subject:** | Please support the Winery at St. George |

I am writing to inform you of my support for the Winery at St. George. As a life-long resident of Yorktown, I am overjoyed to see this historic place in the town restored to its former elegance and made available for this and surrounding communities to enjoy. I urge you to take this opportunity to provide your support in making the opening of the Winery at St. George a reality, including your support of its inclusion in the Agricultural District. Not only will you be providing the community the ability to once again enjoy an historic place in Yorktown's history, you will be supporting new job opportunities for residents of this community as well.

Sincerely,

Arthur Haviland
104 Timberlane Court
Yorktown Heights, NY 10598
914.302.6092

**000502**

4/24/2008

**Crane, Christopher**

| | |
|---|---|
| **From:** | totaljoy@optonline.net |
| **Sent:** | Wednesday, October 24, 2007 11:00 PM |
| **To:** | Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally; Crane, Christopher; Bochow, Brian; Jenkins, Ken; lesiegel@optonline.net; Maisano, James |
| **Cc:** | tomde@TheWineryAtStGeorge.com |
| **Subject:** | The Winery at St. George |

*Honorable Legislators, I am writing to you in connection with The Winery at St. George.*
*I ask you to support this matter currently before you.*

*I have been fortunate to attend an open house tasting and was impressed with the authentic restoration of this historic building. After personally speaking with owner, Tom, and hearing his intention to make this an asset to the area, I offer my support for this project. I feel that this business is unique and will be a sophisticated, upscale addition to the community. As a "senior" woman, I would feel comfortable patronizing this winery.*

*I recognize that you may have a concern regarding the "wetlands"; however, I believe Tom's plans of valet parking will compensate for the use of this building. I honestly do not believe that there will be a tremendous increase in the traffic at that location, especially since this business will mainly be used when many of the neighboring businesses are closed.*

*I am concerned that the people protesting this project would rather have seen this beautiful old building remain un-used and falling in disrepair, rather than encourage it's renovation and use, especially since the previous owners/parishioners seem to be in complete agreement with the current plan.*

*Please consider giving your approval to this new, innovative business. Thank you.*

*Joy Chiulli*
*111 Viewpoint Terrace*
*Peekskill, NY 10566*

000511

## Crane, Christopher

| | |
|---|---|
| **From:** | Yolanda Perlman [yperlman@optonline.net] |
| **ınt:** | Sunday, October 28, 2007 10:16 AM |
| **To:** | Crane, Christopher |
| **Cc:** | tomde@TheWineryAtStGeorge.com |
| **Subject:** | Re: The Winery At St George |

Dear Mr. Abinanti,

My husband and I support the Winery at St. George, and we are writing you for consideration for the same. We feel that this Winery and its' opening for business in our area, will promote the commerce in the area, and at the same time, enhance the community.

The church has been vacant for a long time – as long as we have lived here, and that is 19 years - and it is a much needed breath of fresh air to see an historic building, come to life again!

Thanking you in advance for your consideration to this matter!

Yolanda and Les Perlman
185 Campbell Road
Yorktown Heights, N.Y. 10598
914-245-0550
914-450-7421

No virus found in this outgoing message.
C' ~cked by AVG Free Edition.
    .ion: 7.5.503 / Virus Database: 269.15.12/1095 - Release Date: 10/26/2007 7:54 PM

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.15.12/1095 - Release Date: 10/26/2007 7:54 PM

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.15.12/1096 - Release Date: 10/27/2007 11:02 AM

000515

## Crane, Christopher

| | |
|---|---|
| **From:** | Larry Traola [vetteandi@optonline.net] |
| **ent:** | Thursday, October 18, 2007 10:33 AM |
| **To:** | Maisano, James; lesiegel@optonline.net; Jenkins, Ken; Bochow, Brian; Crane, Christopher; Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally; nicgin245@aol.com |
| **Cc:** | tomde@thewineryatstgeorge.com |
| **Subject:** | The Winery at St. George |

I am writing you on my recent experience at The Old Stone Church - Now "The Winery at St. George" in Mohegan Lake, NY. For as long as I can remember this structure has lied dormant and vacant just waiting for someone to resurrect & restore it. I have been a resident of Yorktown for over 30+ years (as well as I once resided in the Mohegan Lake vicinity) and have always admired the building in passing. For the longest time my wife and I have been a fan of the Wine culture as well as our numerous visits to California's Napa Valley Wine Region. As you might expect, I was ecstatic to hear that wine culture was now coming to my town. Upon receiving my invitation to experience what the new owner has done, I was excited to be a part of a select few to preview this new monument. From the moment you enter, you feel "Welcome". Words cannot describe what Mr. DeChiaro has done. I spent most of my time taking interest at the subtle touches that the new owner has done. Everything from the old pews converted to a tasting area, to the quotations from the bible on wine all add up to a unforgettable experience. I see this as a place where I will spend many of my evenings with my wife to enjoy all that this new venture has to offer. All I can say is, where a once decrepit and aging structure once lied, is now a landmark and monument for the town as well as its residents. A recent North County News artice expressed that Mr. DeChiaro will be making his own wines (from vines that are grown right here in Yorktown!) and that he needs your support to be eligable for the agricultural district. I encourage you to see this beautiful structure for yourself and share support for his vision as well as voice of the people.

Thanks
Lawrence Traola
134 Royce Court
Yorktown Heights, NY 10598

000505

## Crane, Christopher

**From:** Barbara Major [bmcpa2@optonline.net]

**ent:** Tuesday, October 16, 2007 5:00 PM

**To:** Maisano, James; lesiegel@optonline.net; Jenkins, Ken; Bochow, Brian; Crane, Christopher; Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally

**Cc:** tomde@TheWineryAtStGeorge.com

I am so happy Westchester County had to foresight to revitalize "The Old Stone Church" on Route 6 in Yorktown, N.Y and transform itself into the Winery at St. George. I tip my hat off to the person with the vision to restore this Church to its original beauty while giving the locals as well as other residents a great place to connect with friends and family. The Church is truly inspiring; and I think this will stimulate business in the area as well as generate revenue to the town of Yorktown. It is a "win, win, win" for Westchester County.

BARBARA MAJOR, CPA, PLLC
TEL : 732-625-0797

**000498**

4/24/2008

**Crane, Christopher**

| | |
|---|---|
| **From:** | Cathy Volpe [cat8269@msn.com] |
| **ent:** | Tuesday, October 16, 2007 11:21 PM |
| **To:** | Crane, Christopher |
| **Subject:** | The Winery at St. George |

I am writing this letter in support of our new neighbor in Mohegan Lake, The Winery at St. George. The restoration of the old stone church is magnificent. It is such a pleasure to see that beautiful structure finally restored. It is even more pleasing to have this unique type of business brought to our area. For the past few years Mohegan Lake has been over developed with strip malls that have many stores still empty. I applaud Mr. DeChiaro for following through with his vision for this type of business in this area. I was impressed not only with tasteful décor but with the very knowledgeable staff. They knew the history of the building as well as the wines they were serving. Everyone I have spoken to in this community is pleased to have a tasteful, cultured establishment in our neighborhood and the old stone church has kept it's integrity. Please do not be under the misconception that this is a trendy bar. This is the type of business that will spark the interest of people all over the county. I have visited many of the wineries in the Shawagunck Wine Trail and I believe The Winery at St. George will be a prominent name in the future.

In addition the restoration of the old stone church, I think that the planting of grapes at Hanover in Yorktown, to later be made into wine, is a wonderful idea. Promoting a new agricultural product in this area is quite a venture and I applaud Mr. DeChiaro for his hard work and financial investment in this town.

I have been a proud resident of Yorktown for over 15 years and I feel this is positive development for us. I hope that The Town of Yorktown and Westchester County will continue to support Mr. DeChiaro and The Winery at St. George.

Sincerely,
Cathy Volpe
104 Sunfish Landing
Mohegan Lake, NY 10547

**000503**

4/24/2008

**Crane, Christopher**

| | |
|---|---|
| **From:** | chellen322@aol.com |
| **ent:** | Wednesday, October 17, 2007 9:26 AM |
| **To:** | Oros, George |
| **Cc:** | LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally; Crane, Christopher; Jenkins, Ken; Bochow, Brian; lesiegel@optonline.net; Maisano, James |
| **Subject:** | RE: Petition for the St. George Winery Opening |

Dear Elected Officials:

I am a resident of Cortlandt in Northern Westchester in the town of Crompond, NY and understand that there will be a meeting in White Plains on October 29th with all of you and the owner of St. George Winery in Mohegan Lake, Mr. Tom DeChiaro to discuss the opening of his establishment.

I am a professional classical singer and music teacher and feel having a winery in Northern Westchester would be good for the community, in bringing people together culturally as well as socially. The old stone church at 1715 E. Main Street, sat abandoned for more than the 10 years I have lived in the area, and am glad to see someone finally bought, renovated it and is going to do something positive with that piece of property. I looked at the St. George website and was impressed with the progress made there so far.
I hope you will give supporting the opening of "The Winery at St. George" your utmost consideration. Thank you,

Mrs. Helen Fanelli

Member: NYSTA (New York Singing Teachers Association)
        PWSA (Professional Women Singers Association)
        AGMA (American Guild of Musical Artists)

(914)649-7157 cellular phone

---

Email and AIM finally together. You've gotta check out free AOL Mail!

**000504**

4/24/2008

**Crane, Christopher**

| | |
|---|---|
| **From:** | Jeanne and George [gnjgilholm@peoplepc.com] |
| **Sent:** | Saturday, October 20, 2007 11:31 AM |
| **To:** | Schecter, Sally; Crane, Christopher; Bochow, Brian; Jenkins, Ken; lesiegel@optonline.net; Maisano, James |
| **Subject:** | The Winery at St. George, Mohegan Lake, NY |

We heartily support the Winery at St. George and implore you to do everything in your power to facilitate the opening of this business.

Mohegan Lake vitally needs the winery. The Old Stone Church was a very sad sight, the first you see entering our hamlet. Weeds and trees growing all over a building in disrepair as if forgotten and unwanted. Now it is a majestic sight welcoming all who come through. It is a thing of beauty as opposed to the heavy traffic made worse by delivery trucks and car carriers further blocking traffic. We can be very proud of our neighborhood now.

We urge you to support the Winery and hope you'll visit it one day and be as proud as we are to have it here.

George and Jeanne Gilholm
3545 Lakeland Street
Mohegan Lake, NY  10547

_____

PeoplePC Online
A better way to Internet
http://www.peoplepc.com

000506

**Crane, Christopher**

| | |
|---|---|
| **From:** | MaryFrances Lyons [mflyons@yahoo.com] |
| **Sent:** | Monday, October 22, 2007 9:13 AM |
| **To:** | Oros, George; Bochow, Brian; Crane, Christopher; Jenkins, Ken; Kaplowitz, Michael; LaMotte, Ursula; Maisano, James; Schecter, Sally; lesiegel@optonline.net |
| **Cc:** | tomde@thewineryatstgeorge.com |
| **Subject:** | The Winery at St. George |

This e-mail is to support the Winery at St. George. I am a Putnam Valley resident who fully supports and is looking forward to its opening. I have told many friends, family and clients about this Winery and all responses to this is positive. There is nothing like this in the area and as 41 year married women with children there is not place to go out with your husband or friends for an "adult night out" in the area. I believe this is a positive business to have in Westchester. I do not understand why a few individuals who do not support this Winery can cause such havoc.

Before the Winery came it was an eye sore on route six, now it will be a crowning jewel for the road. It can only bring better business to the area.

So please on behalf of us 40 and over crowd please pass what ever you need to do to let this place open and prosper.

Sincerely,
Mary Frances Lyons

---

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around http://mail.yahoo.com

000507

1

**Crane, Christopher**

| | |
|---|---|
| **From:** | Karen Coan [atkinc@comcast.net] |
| **ent:** | Tuesday, October 16, 2007 3:37 PM |
| **To:** | Maisano, James; lesiegel@optonline.net; Jenkins, Ken; Bochow, Brian; Crane, Christopher; Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally |
| **Cc:** | tomde@thewineryatstgeorge.com |
| **Subject:** | Fw: The Winery at St. George - Formerly known as the 'Old Stone Church' |

Dear County Legislators,

I agree with Mr. DeRosa - Now instead of seeing a building in dis-repair and overgrown with unsightly weeds, we have a wonderful place to visit.

Please support this project -

Thanks you
Karen Coan

**From:** jderosa1@comcast.net
**To:** Maisano@westchesterlegislators.com ; lesiegel@optonline.net ; Jenkins@westchesterlegislators.com ; BrianB@westchesterlegislators.com ; ChrisC@westchesterlegislators.com ; Goo6@westchestergov.com ; LaMotte@westchesterlegislators.com ; Kaplowitz@westchesterlegislators.com ; SallyS@westchesterlegislators.com
**Cc:** tomde@TheWineryAtStGeorge.com
**Sent:** Tuesday, October 16, 2007 3:32 PM
**Subject:** The Winery at St. George - Formerly known as the 'Old Stone Church'

ι… am writing to tell you of a recent visit I made to the Winery at St. George, formerly known as the 'Old Stone Church' on Rt. 6, Yorktown, N.Y. I was very impressed with the care taken by the new owner to maintain the very impressive features of the original design for both the exterior as well as interior of the building. For over two decades, this beautiful building sat dormant in disrepair, non accessible by the community. The new use of the building will allow residents to enjoy this impressive building at no cost to the taxpayers. In fact, the winery will create jobs for local residents and provide sales & property tax revenues to the town and county. I encourage you to pay a visit to the Winery at St. George to see for your self how the original beauty of the property has been maintained while at the same time given it a useful purpose for all of the community to enjoy. Having done this, I'm sure you too will join your many constituents who are very excited about having the Winery at St. George as an important part of their community.

Thanks
Regards,
John DeRosa
914 299 7052
jderosa1@comcast.net

000496

4/24/2008

## Crane, Christopher

| | |
|---|---|
| **From:** | Taryn Leung [tleung@ultrafabricsllc.com] |
| **ent:** | Tuesday, October 16, 2007 3:35 PM |
| **To:** | Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally; Crane, Christopher; Bochow, Brian; Jenkins, Ken; 'Judith Myers -'; Maisano, James |
| **Cc:** | tomde@TheWineryAtStGeorge.com |
| **Subject:** | SUPPORT OF THE WINERY! |

To whom it may concern,

   I completely support the Winery at St. George. It's about time our town has a beautiful place to visit and engage in good old fashion wine tasting. There are not many wineries around here; the best ones are either out on Long Island or in Warwick, NY. The restoration has come along wonderfully and it is so exciting to await the Winery at St. George's opening.

I support this wonderful addition to our economy!

Taryn Leung
Purchasing Coordinator
Ultrafabrics LLC.
914.460.1723 T
914.347.1591 F


Ultra Surfaces. Ultra Relevant

*000495*

4/24/2008

## Crane, Christopher

| | |
|---|---|
| **From:** | jderosa1@comcast.net |
| **.ent:** | Tuesday, October 16, 2007 3:33 PM |
| **To:** | Maisano, James; lesiegel@optonline.net; Jenkins, Ken; Bochow, Brian; Crane, Christopher; Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally |
| **Cc:** | tomde@TheWineryAtStGeorge.com |
| **Subject:** | The Winery at St. George - Formerly known as the 'Old Stone Church' |

I'm am writing to tell you of a recent visit I made to the Winery at St. George, formerly known as the 'Old Stone Church' on Rt. 6, Yorktown, N.Y. I was very impressed with the care taken by the new owner to maintain the very impressive features of the original design for both the exterior as well as interior of the building. For over two decades, this beautiful building sat dormant in disrepair, non accessible by the community. The new use of the building will allow residents to enjoy this impressive building at no cost to the taxpayers. In fact, the winery will create jobs for local residents and provide sales & property tax revenues to the town and county. I encourage you to pay a visit to the Winery at St. George to see for your self how the original beauty of the property has been maintained while at the same time given it a useful purpose for all of the community to enjoy. Having done t his, I'm sure you too will join your many constituents who are very excited about having the Winery at St. George as an important part of their community.

Thanks
Regards,
John DeRosa
914 299 7052
jderosa1@comcast.net

000**493**

4/24/2008

**Crane, Christopher**

| | |
|---|---|
| **From:** | Marchsnowvpa@aol.com |
| **ent:** | Friday, October 26, 2007 4:17 PM |
| **To:** | Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally; Crane, Christopher; Bochow, Brian; Jenkins, Ken; lesiegel@optonline.net; Maisano, James |
| **Cc:** | tomde@TheWineryAtStGeorge.com |
| **Subject:** | Winery at St George |

Dear County Legislators:

1. George Oros
2. Ursula LaMotte
3. Mike Kaplowitz
4. Martin Rogowsky
5. Thomas Abinanti
6. Jose Alvarado
7. Ken Jenkins
8. Judith Myers
9. Jim Maisano

I would like you to know that I support having The Winery at St George.

Thank you for your kind attention.

Victoria Amoruso
Yorktown Hts, NY

PS: I apologize for the previous email that was mistaken sent before editing.

See what's new at AOL.com and Make AOL Your Homepage.

**000514**

4/24/2008

**Crane, Christopher**

---

**From:** Crane, Christopher
**Sent:** Monday, October 29, 2007 10:19 AM
**To:** Abinanti, Thomas
**Subject:** FW: The Winery At St George

---

**From:** Yolanda Perlman [mailto:yperlman@optonline.net]
**Sent:** Sunday, October 28, 2007 10:16 AM
**To:** Crane, Christopher
**Cc:** tomde@TheWineryAtStGeorge.com
**Subject:** Re: The Winery At St George

Dear Mr. Abinanti,

My husband and I support the Winery at St. George, and we are writing you for consideration for the same. We feel that this Winery and its' opening for business in our area, will promote the commerce in the area, and at the same time, enhance the community.

The church has been vacant for a long time – as long as we have lived here, and that is 19 years – and it is a much needed breath of fresh air to see an historic building, come to life again!

Thanking you in advance for your consideration to this matter!

Yolanda and Les Perlman
    Campbell Road
Yorktown Heights, N.Y.  10598
914-245-0550
914-450-7421

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.15.12/1095 - Release Date: 10/26/2007 7:54 PM

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.15.12/1095 - Release Date: 10/26/2007 7:54 PM

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.15.12/1096 - Release Date: 10/27/2007 11:02 AM

000516

4/24/2008

**Crane, Christopher**

| | |
|---|---|
| From: | cotuit@optonline.net |
| ent: | Tuesday, October 16, 2007 2:49 PM |
| To: | Crane, Christopher |
| Cc: | tomde@theWineryAtStGeorge.com |
| Subject: | Support |

I am in full support of the Winery!

000492

4/24/2008

**Crane, Christopher**

From:     Crane, Christopher
ₐnt:      Tuesday, October 16, 2007 3:34 PM
To:       Abinanti, Thomas
Subject:  FW: The Winery at St. George - Formerly known as the 'Old Stone Church'

FYI, see comment below on Winery application to Agric. District.

---

From: jderosa1@comcast.net [mailto:jderosa1@comcast.net]
Sent: Tuesday, October 16, 2007 3:33 PM
To: Maisano, James; lesiegel@optonline.net; Jenkins, Ken; Bochow, Brian; Crane, Christopher; Oros, George; LaMotte, Ursula; Kaplowitz, Michael; Schecter, Sally
Cc: tomde@TheWineryAtStGeorge.com
Subject: The Winery at St. George - Formerly known as the 'Old Stone Church'

I'm am writing to tell you of a recent visit I made to the Winery at St. George, formerly known as the 'Old Stone Church' on Rt. 6, Yorktown, N.Y.  I was very impressed with the care taken by the new owner to maintain the very impressive features of the original design for both the exterior as well as interior of the building.  For over two decades, this beautiful building sat dormant in disrepair, non accessible by the community.  The new use of the building will allow residents to enjoy this impressive building at no cost to the taxpayers.  In fact, the winery will create jobs for local residents and provide sales & property tax revenues to the town and county.   I encourage you to pay a visit to the Winery at St. George to see for your self how the original beauty of the property has been maintained while at the same time given it a useful purpose for all of the community to enjoy.  Having done t his, I'm sure you too will join your many constituents who are very excited about having the Winery at St. George as an important part of their ᵢ  munity.

Thanks
Regards,
John DeRosa
914 299 7052
jderosa1@comcast.net

000494

4/24/2008

**From:** Thomas DeChiaro [mailto:tomde1@comcast.net]
**Sent:** Friday, April 11, 2008 9:59 AM
**To:** tomde1@comcast.net; ABC Public Affairs
**Subject:** Copy of Files for: Application Serial Numbers 1193712 & 1193713
**Importance:** High

1

Kimberly Morrell,

RE: Application Serial Numbers: 1193712 & 1193713

I respectfully request copies of my pending applications and all other information associated with Serial Numbers 1193712 & 1193713 for ATK Consulting, Inc. d/b/a/ The Winery at St. George.

I am requesting the following information:
1. Full copy of application files including all information submitted by my attorney.
2. All correspondence between the SLA and the Town of Yorktown, its board members, Supervisor, or any representative for the Town of Yorktown with regard to the serial numbers listed above. This should include all information such as, but not limited to, e-mails, phone call records, mail, letters, and any other form of documentation, correspondence and/or communications.
3. Any and all correspondence between the SLA and any representative of the County of Westchester including county employees, elected officials, etc. This should include all information such as, but not limited to, e-mails, phone call records, mail, letters, and any other form of documentation, correspondence and/or communications.

If you have any questions, or need clarification, please don't hesitate to contact me at (914) 262-7313.

Once files are ready, I can pick them up, or they can be sent to:

Thomas DeChiaro
ATK Consulting, Inc. d/b/a/ The Winery at St. George
10 Gilead Road
Mahopac, NY 10541
(914) 262-7313

Thank you for your attention to this request.

Thomas DeChiaro
ATK Consulting, Inc. d/b/a/ The Winery at St. George
10 Gilead Road
Mahopac, NY 10541
(914) 455-4272
(914) 455-4273 – fax
(914) 262-7313 - Cell

-----Original Message-----
**From:** ABC Public Affairs [mailto:PublicAffairs@abc.state.ny.us]
**Sent:** Wednesday, April 16, 2008 9:17 AM
**To:** Thomas DeChiaro
**Subject:** RE: Copy of Files for: Application Serial Numbers 1193712 & 1193713

Dear Mr. DeChiaro,

We have been unable to locate the physical file for either items in your request below.  We have conducted a detailed search for them both over the last few days and yielded nothing new at this point.

We will be in touch later today should one more avenue we are trying becomes available.

Best Regards,
Kimberly Morella
Deputy Director of Communications
Division of Alcoholic Beverage Control
www.abc.state.ny.us