**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

OLD ST GEORGE'S LLC, ATK CONSULTING INC. and THOMAS DeCHIARO

Plaintiffs,

-against-

NICHOLAS BIANCO, individually,
LOUIS CAMPISI, individually,
LINDA COOPER, individually,
BRUCE BARBER, individually,
JOHN TEGEDER, individually,
WILLIAM D. GREGORY, individually,
THE TOWN OF YORKTOWN, and
GEORGE OROS, individually,

Defendants.
------------------------------------------------------------X

08 CIV. 5321

JUDGE ROBINSON

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, by their attorneys, Campanelli & Associates, P.C., as and for their complaint respectfully allege as follows:

## I NATURE OF THE ACTION

1. This is a civil action seeking equitable relief, compensatory damages, punitive damages, costs and attorneys fees, brought pursuant to 42 U.S.C. §§1983, 1985 and 1988, to redress violations of the plaintiffs' rights to petition the government for the redress of grievances, as guaranteed under the 1st Amendment to the United States Constitution, and violations of the plaintiffs' rights to due process as guaranteed under 5th and 14th Amendments to the United States Constitution.

## II JURISDICTION AND VENUE

2. Jurisdiction of the court is invoked pursuant to 28 U.S.C. §1331 in that this is a civil action arising under the Constitution and laws of the United States.

3. Jurisdiction of the court is also invoked pursuant to 28 U.S.C. §1343(a)(3) and §1343(a)(4) to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

4. Plaintiffs seek declaratory relief and compensatory damages pursuant to 28 U.S.C. §§ 2201(a) and 2202.

5. Plaintiffs seek permanent injunctive relief pursuant to Fed. R. Civ. P. 65.

6. Plaintiffs seek reasonable attorney's fees as part of the costs authorized to the prevailing party in an action pursuant to 42 U.S.C. §1983, predicated upon 42 U.S.C. §1988 and 42 U.S.C. §2000.

7. Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in Westchester County, New York, and each of the defendants' actual place of business and/or employ was within the Southern District of New York.

## III THE PARTIES

### A The Plaintiffs

8. At all relevant times mentioned herein, plaintiff, OLD ST GEORGE'S LLC, (hereinafter "Old St George") was and still is a Limited Liability Company duly organized under the laws of The State of New York, with its principal place of business located at 10 Gilead Road, Mahopac, County of Putnam, New York 10541.

9. At relevant times described herein, plaintiff Old St George was, and remains, the owner of the real property situated at Route 6, at 1715 E. Main Street, in Mohegan Lake, New York.

10. At all relevant times mentioned herein, plaintiff, A T K CONSULTING INC (hereinafter "ATK Consulting") was and still is a Corporation duly organized under the laws of The State of New York, with its corporate offices located at 10 Gilead Road, Mahopac, County of Putnam, New York 10541.



11. At relevant times described herein, plaintiff ATK Consulting became entitled to occupancy of the real property situated at Route 6, at 1715 E. Main Street, in Mohegan Lake, New York. ATK CONSULTING INC.



12. At all relevant times mentioned herein, plaintiff THOMAS DeCHIARO, was and still is an individual residing at 10 Gilead Road, Mahopac, County of Putnam, New York 10541.



13. At all relevant times mentioned herein, plaintiff, Thomas DeChiaro was, and remains the controlling member of plaintiff Old St. George.

14. At all relevant times mentioned herein, plaintiff, Thomas DeChiaro was, and remains, the sole shareholder, and President of, plaintiff ATK Consulting.

B. The Defendants

15. At all relevant times mentioned herein, defendant NICHOLAS BIANCO, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

16. At all relevant times mentioned herein, defendant NICHOLAS BIANCO, was a Councilman of the Town of Yorktown, and a Member of the Town Board.

17. At all relevant times mentioned herein, defendant LOUIS CAMPISI, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

18. At all relevant times mentioned herein, defendant LOUIS CAMPISI, was a Councilman of the Town of Yorktown, and a Member of the Town Board.

19. At all relevant times mentioned herein, defendant LINDA COOPER, is an individual with an actual place of business or employ was at 363 Underhill Avenue, Yorktown Heights, NY 10598.

20. As of the date of the commencement of this action, defendant LINDA COOPER'S actual place of business and or employ is now situated at 16 Croton Avenue, Ossining, NY 10562.

21. At relevant times mentioned herein, defendant LINDA COOPER, was the Supervisor of the Town of Yorktown, and a Member of the Town Board.

22. At all relevant times mentioned herein, defendant BRUCE BARBER, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

23. At all relevant times mentioned herein, defendant BRUCE BARBER, was the Environmental Code Officer for the Town of Yorktown

24. At all relevant times mentioned herein, defendant JOHN TEGEDER, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

25. At all relevant times mentioned herein, defendant JOHN TEGEDER, was, and remains, The Director of Planning of the Town of Yorktown.

26. At all relevant times mentioned herein, defendant WILLIAM D. GREGORY, was and still is an individual with an actual place of business or employ situated at 363 Underhill Avenue, Yorktown Heights, NY 10598.

27. Upon information and belief, at all relevant times mentioned herein, defendant, WILLIAM D. GREGORY was, and remains, a Building Inspector employed by the Town of Yorktown.

28. At all relevant times mentioned herein, the defendant, THE TOWN OF YORKTOWN (hereinafter referred to as the "TOWN"), was and continues to be a municipal corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 363 Underhill Avenue, Yorktown Heights, NY 10598.

29. Upon information and belief, at all relevant times mentioned herein, the TOWN, by its agents and/or employees, operated, maintained and controlled The Yorktown Town Board, The Yorktown Planning Board, The Yorktown Building Department and the Office of The Town Clerk.

30. At all relevant times mentioned herein, defendant GEORGE OROS, was, and remains, a Legislator employed by the County of Westchester, New York

31. At all relevant times mentioned herein, defendant GEORGE OROS, was and still is, an individual with an actual place of business or employ situated at 148 Martine Avenue, White Plains, New York 10601.

## IV PRELIMINARY FACTS

### A. Introduction

32. This action concerns efforts by the plaintiffs, Thomas DeChiaro and his closely held companies, to operate a vineyard and winery within the County of Westchester, upon two parcels of property, one of which is owned by the County of Westchester, and the other being owned by the plaintiffs.

33. The plaintiffs leased real property from the County of Westchester, with the County having knowledge that the plaintiffs intended to employ the property as a vineyard upon which to grow wine-making grapes, a use for which the property is acutely suited, since the property is physically situated within the federally certified "*Hudson River Region.*"

34. The *Hudson River Region* is a bounded geographic region which, on July 6, 1982, was certified by the United States Department of Treasury Alcohol and Tobacco Tax and Trade Bureau as an "American Viticulteral Area" (AVA), that being a federally designated wine-grape growing region under The United States Code of Federal Regulations Title 27, Part 9, §9.47.

35. Under federal law, the operators of vineyards in federally certified AVAs are permitted, subject to federal regulations, to produce and market wines made from grapes grown within their respective AVA, and to cause their bottling labels to indicate that the wines were produced from grapes grown within their AVA, provided that not less that 85% of the grapes employed in making such wines were actually grown within the indicated AVA wine-grape growing region.

36. Under New York State Law, the growing and processing of grapes into wine is recognized as a "farm operation" which falls within the purview of New York Agriculture and Markets Law (Agr. & M), Article 25-AA §301(11).

New York State Agricultural Districts Law

37. In 1971, the State of New York enacted New York's Agricultural Districts Law Article 25-AA, to provide New York State oversight over farming operations within the State, to enable the State to not only encourage that real property situated within the State be used for farming, irrespective of whether it is owned, or rented, but also to ensure that persons who seek to engage in farming operations are protected, by the State, against unreasonable interference by local governments, such as the Town of Yorktown.



38. By enacting such legislation, the State Legislature ensured that both its intent and its goals were made "crystal clear" by formally adopting an affirmative declaration of its findings and intent.

39. As adopted, New York Agriculture and Markets Law Article 25-AA 300 provides as follows:

"§300. Declaration of legislative findings and intent

> It is hereby found and declared that many of the agricultural lands in New York state are in jeopardy of being lost for any agricultural purposes. When nonagricultural development extends into farm areas, competition for limited land resources results. Ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements, often leading to the idling or conversion of potentially productive agricultural land.
>
> The socio-economic vitality of agriculture in this state is essential to the economic stability and growth of many local communities and the state as a whole. It is, therefore, the declared policy of the state to conserve, protect, and encourage the development and improvement of its agricultural land for production of food and other agricultural products. It is also the declared policy of the state to conserve and protect agricultural lands as valued natural and ecological resources which provide needed open spaces for clean air sheds, as well as for aesthetic purposes."
>
> New York Agriculture and Markets Law Article 25-AA, §300.

40. In accord with the explicitly stated legislative intent behind Agr. & M Law Article 25-AA, the New York State Legislature enacted section §305 for the purpose of protecting persons who seek to engage in farming activities, from otherwise overly restrictive rules and ordinances of local governments, such as the defendant Town of Yorktown.



41. As enacted, New York State Agricultural and Markets Law §305-a explicitly provides that:

> "Local governments . . . shall not unreasonably restrict or regulate farm operations within agricultural districts in contravention of the purposes of this article unless it can be shown that the public health or safety is threatened"
>
> Agricultural and Markets Law Article 25-AA §305-a

42. As intended by the State Legislature, persons who seek to engage in farming operations could secure protections, in the form of affirmative New York State oversight, against local government "unreasonably" interfering with their farming operations.

43. To enable persons to secure such State protection, the New York State Legislature created a statutory right for farm operators to file an application to have their respective farming operation added into an existing "Agricultural District." *See* Agricultural & Markets Law Article 25-AA §303, §303-b.

44. Once a farm operation is included into an Agricultural District, The New York State Commissioner of Agriculture and Markets becomes empowered to review any existing or proposed local law or ordinance to determine whether such local rule or ordinance is overly restrictive, or is being applied in a manner which unreasonably interferes with the farming operation.

45. To the extent that the Commissioner finds that any such local law or ordinance is overly restrictive or unreasonably interferes with such farming operation, New York State law prohibits any local government, such as the Town of Yorktown, from applying such local law or ordinance to the farming operation.

46. As explicitly provided by statute, the Commissioner may initiate such a review entirely on its own, or upon the request of a landowner within an Agricultural District.

47. To the extent that any local government seeks to apply any law or ordinance which the Commissioner has found to unreasonably restrict such farm operations, the Commissioner is statutorily empowered to commence an action in the New York State Supreme Court to enforce §305-a, and obtain a court order permanently enjoining the local government from any efforts to apply their local law or ordinance against the farming operation.

48. Acting squarely within with his statutory rights under New York Agriculture and Markets Law §303-b, in 2006, Mr. DeChiaro submitted an application to the County of Westchester to have his vineyard and winery included into the County's pre-existing Agricultural District (Westchester County Agricultural District No. 1).

49. Upon learning that Mr. DeChiaro had filed an application with the County of Westchester under §303-b, the defendants became openly angered by what they perceived of as, and publically proclaimed to be, a deliberate effort to "circumvent their local zoning authority."

50. Driven by such anger, as exacerbated as a result of Mr. DeChairo's failure and/or refusal to pay one or more of the defendants "political graft monies," (as had been done by the previous owner of the plaintiffs' property) the defendants conspired to retaliate, and have retaliated, against the plaintiffs, and have employed all means in their power, both lawful and unlawful, to prevent the plaintiffs from operating their winery, and to punish Mr. DeChiaro for having offended them.

51. As defendant NICHOLAS BIANCO has explicitly stated to numerous persons within the Town, he will "*never*" permit the plaintiffs' winery to open, because he "doesn't like the fact that Mr. DeChiaro went to the County for inclusion into the Agriculture District."

52. Thereafter, in a deliberate effort to conceal their actions, the defendants conspired to prevent the plaintiffs from securing evidence of the defendants' actions by concealing and destroying records, and causing others to destroy and conceal records, in a calculated effort to additionally deprive the plaintiffs of their statutory rights to secure such records under New York State Freedom of Information Laws, and to prevent the plaintiffs from securing evidence of their violations of plaintiffs' Constitutionally protected rights.

**B. The Plaintiffs' Desire To Operate a Vineyard and Winery in Accord with Federal and State Laws**

53. During or about 2005, plaintiff Thomas DeChiaro became desirous of pursuing the operation of a vineyard and winery, within which he would grow and harvest wine grapes, and process them into a locally produced New York State wine.

54. Towards this end, Mr. DeChiaro leased a parcel of property, described herein above, from the County of Westchester within the federally certified *Hudson River Region*.

55. The farming and agricultural production of grapes into wine requires a place to process the grapes being grown, through processes of de-stemming, crushing, fermentation, and bottling.

56. To fulfill this function of his vineyard and winemaking operation, Mr. DeChiaro purchased real property closely situated to the County-Owned Parcel, on Route 6, at 1715 E. Main Street, in Mohegan Lake, New York.

57. Upon this property sits a structure which is commonly known as "*The Old Stone Church*," which has remained unused and unoccupied for the past twenty (20) years.

58. Mr. DeChiaro had been highly selective in choosing these closely situated specific locations for his vineyard and winery operation, as he sought to derive the benefit of their unique characteristics.

59. First, the vineyard is situated within the *Hudson River Region* which is home to the oldest continuously operating winery in North America, the *Brotherhood Winery* (established in 1839), as well as the oldest continuously cultivated vineyard in North American (operated by *Benmarl Winery*).

60. So long as least 85% of the grapes Mr. DeChiaro would use to produce his wine were grown at this location, under federal law, his wine labels could indicate that the wine was produced from this federally certified AVA *Hudson River Region*, from which wines have been produced since at least 1839.

61. Second, the property is situated at a high elevation, with virtually no shade, thereby effectuating constant sun exposure at all points throughout the day, an essential facet of successful grape production.

62. Third, the property is in close proximity to, and concomitantly derives positive microclimate effects from, the New York City watershed.

63. These natural microclimate effects include the tempering of cold air in the winter, and the tempering of hot air in the summer, each of which are advantageous as protections to vineyards.

DKi

64. Fourth, as Mr. DeChiaro had learned from an independent testing laboratory, to whom the County of Westchester had submitted soil samples, the condition and nature of the soil on the property is favorable for use in the growing of wine-making grapes.

DKi

65. Finally, the Old Stone Church was remarkably suited as a home to the wine-making, wine-tasting and selling portion of his intended vineyard/winemaking operation.

DKi

66. Aside from its close proximity to the vineyard, where his grapes have now been growing since May of 2007, the antiquity and "old world" beauty of the nearly one (100) hundred year Old Stone Church was remarkably suited, and uniquely attractive, as a home to his winery operation, and is uniquely suited to attract business for same.

DKi

C. **The *Palmietto* Acquisition Of The Old Stone Church**

67. Plaintiff Thomas DeChiaro purchased the Old Stone Church from an individual by the name of Michael Palmietto.

68. Mr. Palmietto had purchased the Old Stone Church, in or about 2000, with the intention of converting it into a café.

69. At the time of Mr. Palmietto's purchase, defendant NICHOLAS BIANCO was a member of the Yorktown Town Board.

70. Upon Mr. Palmietto's purchase of the property, defendant BIANCO suggested to Mr. Palmietto that he change his plans to convert the Old Stone Church to a restaurant, instead of a café.

71. Once Mr. Palmietto agreed to do so, defendant BIANCO agreed to support Mr. Palmietto's efforts to convert the Old Stone Church into a restaurant.

72. As part of that support, defendant BIANCO appeared on a local television broadcast, and explicitly stated that he thought that the site was a "fine place for a restaurant" and indicated his unequivocal support of the use of the Old Stone Church as a commercial restaurant.

73. In connection with defendant BIANCO'S "support" of Mr. Palmietto's project, however, when Mr. Palmietto began to pursue the Town approvals necessary for such conversion, defendant BIANCO began making "requests" that Mr. Palmietto commence making contributions to defendant BIANCO, for political dinners and/or other political purposes.

74. Annexed hereto as Exhibit "A" is a sworn Affidavit wherein Michael Palmietto attests to such requests he received from defendant BIANCO.

75. Significantly, in making these requests defendant BIANCO "insisted" that Mr. Palmietto make such contributions "*in cash*." *See* Exhibit "A" at page 1, paragraph 10.

76. In addition, despite the fact that Mr. Palmietto was paying for such dinners, defendant BIANCO requested of Mr. Palmietto that he not actually attend any dinners which he had paid for, "to avoid raising any suspicions." *See* Exhibit "A" at page 1, paragraph 10.

77. For a period of three (3) years during which defendant BIANCO claimed to support Mr. Palmietto's project, Mr. Palmietto contributed over $3,000 in cash contributions to defendant BIANCO, all at defendant BIANCO's request. *See* Exhibit "A" at page 2, paragraph 11.

78. Upon learning of these "contributions" which were being paid to defendant BIANCO in response to his request for same, another Town Board Member, defendant LOUIS CAMPISI also commenced seeking "contribution" monies from Mr. Palmietto.

79. Upon information and belief, defendant CAMPISI caused Yorktown Highway Superintendent, Eric DiBartolo to approach Mr. Palmietto on numerous occasions, and to request "contributions" for defendant CAMPISI. *See* Exhibit "A" at page 2, paragraph 12.

80. In requesting these contributions for defendant CAMPISI, Mr. DiBartolo advised Mr. Palmietto that Mr. CAMPISI'S vote, in favor of the Town Board approval needed by Mr. Palmietto, was "in the bag." *See* Exhibit "A" at page 2, paragraph 12.

81. In the months which followed, Mr. Palmietto received additional requests from Mr. DiBartolo, and paid him additional sums which eventually totaled seven thousand $7,000.00 dollars. *See* Exhibit "A" at page 2, paragraph 13.

D-

D-

D-

D-

D-

D-

D-

82. In requesting and receiving such monies, Mr. DiBartolo explicitly advised Mr. Palmietto that the monies were being used "for political campaigns which would help get Mr. Palmietto's project approved." *See* Exhibit "A" at page 2, paragraph 13.

83. During the period within Mr. Palmietto was pursuing the Town approvals necessary to open his restaurant, which included Town Board approval, Mr. Palmietto had "contributed" a cumulative sum of over ten thousand ($10,000.00) dollars in response to requests he had received from defendant Town Board Members BIANCO and CAMPISI.

84. Upon information and belief, although it was initially unknown to defendant BIANCO, defendant BIANCO ultimately came to learn that Mr. Palmietto had been "contributing" monies to defendant CAMPISI at the same time than he had been "contributing" monies to defendant BIANCO.

85. Upon learning of same, defendant BIANCO became upset, and affirmatively directed Mr. Palmietto to stop giving money to defendant CAMPISI, either directly or through Mr. DiBartolo. *See* Exhibit "A" at page 2, paragraph 18.

86. Upon information and belief, upon ultimately learning that the lion's share of more than ten thousand ($10,000.00) dollars had been given to CAMPISI rather than to him, defendant BIANCO became angered and possessed of an intent to now defeat Mr. Palmietto's project, in retaliation.

87. Towards this end, defendant BIANCO wielded his influence over, and conspired with, the other Town Board members, thereby causing them to vote against Mr. Palmietto's project, thereby defeating it.



Town always tries to save the church

88. Simultaneously, in a deliberate and calculated effort to ensure the "death" of Mr. Palmietto's project, defendant BIANCO posited that the property should be acquired by the Town and converted into a museum.

89. Once asserting this position, defendant BIANCO approached Mr. Palmietto and directed him to "think of a price."

D

90. Unwilling to bow to defendant BIANCO's demands to surrender the property to the Town, and despite defendant BIANCO'S success in causing the Town to vote against his project, Mr. Palmietto sought to secure a purchaser who would buy the property from him, at market value.

D

91. Mr. Palmietto succeeded in securing an offer of $750,000.00 from a potential purchaser, subject to Mr. Palmietto's ability to secure a sewer permit from the Town.

D

92. Not surprisingly, however, Mr. Palmietto was unable to secure such sewer permit from the Town.

D/K/I maybe wetlands

93. Upon information and belief, defendants BIANCO, CAMPISI and COOPER wielded their influence within the Town to prevent Mr. Palmietto from securing sewer permits, with the intended purpose of preventing Mr. Palmietto from selling the property to the third party who was desirous of purchasing it from Mr. Palmietto.

D

94. The defendants' efforts were successful, as the purchaser abandoned the purchase as a result of Mr. Palmiettos inability to secure the sewer permits.

D

95. Thereafter, a separate individual, Mr. Bondi, acting under the direction of, and in conspiracy with, defendant BIANCO, approached Mr. Palmietto and offered him $400,000.00 to purchase the property. *See* Exhibit "A" at page 3, paragraph 28.

D

96. As had apparently been arranged by defendant BIANCO, the Town defendants immediately "endorsed" what they believed to be the pending sale to Mr. Bondi, and then proceeded to issue the needed sewer permits without delay. *See* Exhibit "A" at page 3, paragraph 29.

97. Much to the dismay of defendant BIANCO, and the other defendants, however, Mr. Palmietto did not proceed to sell the property to the purported buyer which had been chosen by defendant BIANCO.

98. Instead, Mr. Palmietto sold the property to plaintiff Thomas DeChiaro herein, which further offended the defendants. *See* Exhibit "A" at page 3, paragraph 30.

**D. The *DeChiaro* Acquisition Of The Old Stone Church And Encounter With Corruption Inherent Within The Town of Yorktown Government**

99. In 2005, plaintiff Thomas DeChiaro purchased the Old Stone Church with the intent of using the property for his combined vineyard and winery operation.

100. As set forth herein above, Mr. DeChiaro had selected the Old Stone Church as a location at which to pursue creation of a vineyard and winery because of the unique physical characteristics of the properties, and the federal and state laws which govern the use of the properties for such a farming operation.

101. Upon purchasing the Old Stone Church, plaintiff Thomas DeChiaro was made immediately aware of blatant corruption within the Town, as deliberately carried out and enforced by the defendants herein.

102. As had been made clear to Mr. DeChiaro by Mr. Palmietto, the previous owner of the Old Stone Church, when a person or entity seeks to pursue commercial use of property within the Town of Yorktown, the defendants would seek "political contributions," *in cash*, from such person or entity.

103. So long as the recipient of such requests responded by making such "contributions," the defendants would process and approve whatever applications would be necessary for the project to be completed.

104. In addition, the defendants personally, or through their agents, would "tell" property owners which specific contractors or other service providers they "needed" to hire, in developing their property, and seeking any Town approvals in connection therewith.

105. If, as Mr. DeChiaro would learn, a property owner rebuffed or refused such requests, the defendants would deliberately delay or prevent the property owner from securing approvals necessary for the property owner to pursue their desired commercial venture.

106. Consistent with what Mr. Palmietto had experienced earlier, upon Mr. DeChiaro making it known to the defendants that he was seeking to open a winery at the Old Stone Church, plaintiff DeChiaro began to receive similar "contribution requests" and "hiring directions" from the defendants.

107. First, representatives of the Town "suggested" that Mr. DeChiaro "should" retain a specific attorney in connection with his applications, and they advised him that he "needed" to hire a specific contractor to perform his electrical work.

108. Thereafter, several representatives of the Town approached Mr. DeChiaro and "requested" that he commence making financial "contributions" to defendant BIANCO.